[No. 418.    August 12, 1891.]

## WILLIAM N. COLER, APPELLEE, v. BOARD OF COUNTY COMMISSIONERS OF SANTA FE COUNTY, APPELLANT.

COUNTY BONDS IN AID OF RAILROADS—SUIT ON INTEREST COUPONS—ASSUMPSIT—EXECUTION BY BOARD—SIGNATURE OF PROBATE JUDGE—VALIDITY OF ISSUE.—In an action of assumpsit to recover the amount of overdue interest coupons on bonds of the county of Santa Fe, issued under the act of February 1, 1872, authorizing the counties of the territory to issue bonds in aid of railroads, where the bonds to which the coupons were attached were executed by the board of county commissioners after the passage of the "County Commissioners' Act" of 1876, authorizing and empowering the board to execute bonds issued under the act of 1872, supra, it was the act of the county in its corporate capacity, and the signature of the probate judge thereto was unnecessary, and did not affect the validity of the issue.

ID.—RATE OF INTEREST, LEGALITY OF.—Where the qualified electors of a county have fixed the rate of interest on bonds issued under the act of February 1, 1872, in aid of railroads, as provided in the second section thereof, at seven per cent, such rate so fixed is valid, especially in view of the passage of another act at the same session of the legislature abolishing usury. Chap. 19, Laws, 1872.

ID.—LIMITATION—SEC. 1863, COMP. LAWS, 1884.—Where, as in the case at bar, an action is founded on written instruments, the four years' statute of limitation does not apply. Sec. 1863, Comp. Laws.

ID.—LIMITATION—SEC. 1862, COMP. LAWS, 1884—STIPULATION—RESOLUTION OF BOARD AUTHORIZING LOAN TO PAY INTEREST.—Nor will the six years' statute of limitation (sec. 1862, Comp. Laws), apply to those coupons which matured in 1881, it having been stipulated that taxes were levied for their payment, and the board of county commissioners having recognized the interest due as a continuing liability,

before the six years could attach, by the passage of a resolution, at its regular session of June 7, 1886, authorizing such loan to be made as might be necessary to meet this interest at maturity, which was a formal official recognition of the bonds, as well as an admission of the obligation to pay the interest due on the bonds, and was provable, both as an acknowledgment and as an account stated, under the common counts; and if enough of the interest money, so levied by taxation, was misappropriated, to have paid these coupons, and the conversion occurred more than six years before the action, the defendant should have shown that fact.

ID.—STIPULATION BY ATTORNEYS AMENDATORY OF PLEADINGS.—In such case, a stipulation by the attorneys that "the pleadings, bill of particulars, and other proceedings, shall be deemed and considered as hereby amended so as to embrace the plaintiff's claim on coupons clipped from the bonds aforesaid, to the amount of $19,915 * * * as well as the plaintiff's claim already specified in the papers on file herein, and also to conform to the facts as to the form and recitals," etc., was valid, and, on a recovery, judgment was properly entered for the amount therein stipulated.

ID.—INTEREST COUPONS, ADMISSIBILITY OF—EVIDENCE.—In a suit on interest coupons, where there was no plea denying under oath the execution of the coupons, they were admissible in evidence under the common money counts, without any further proof of their execution. Sec. 1878, Comp. Laws, 1884.

ID.—BONA FIDE HOLDER—BURDEN OF PROOF—EVIDENCE.—Where bonds were issued within the scope of a lawful power, and their recitals import the performance of all the conditions precedent, any irregularities in the exercise of the power, while they might, perhaps, have avoided the bonds as between the county and the railroad, are not available as a defense against a subsequent bona fide holder. In such case, it was incumbent on the county to show affirmatively that such holder had knowledge of the irregularities in order to avoid the securities.

ID.—NEGOTIABILITY OF, IN HANDS OF BONA FIDE HOLDER.—Where such bonds stated on their face the purpose for which they were issued, and that purpose was a lawful one, and the recitals showed a compliance with the law, they became negotiable securities, unimpeachable in the hands of bona fide holders, except for want of jurisdiction in the board of county commissioners.

ID.—STIPULATION—PRESUMPTION.—Where, in such case, it was stipulated that a certain bond "number 45" was one of the bonds from which the coupons were detached, "the said bonds being issued in several series, and all of them in form, tenor, and recitals substantially like the said bond number 45," such stipulation did not imply that the bonds of the several series were of the same date, nor that they matured at the same time. The presumption is they were legally

issued, and that, therefore, the different series were made to mature in different years, in order to be within the terms of section 1 of the act of 1872, providing that "the amount of bonds or other evidences of debt that may become due in any year shall not exceed two per centum of the assessed value of the property of the county at the time of issuing such bonds or other evidences of debt."

ID.—ASSESSMENT—EVIDENCE.—A book purporting to be the assessor's register of assessments for the year 1879, offered in evidence, containing erasures, interpolations, and alterations, and uncertified as required by law, was invalid, and incompetent to prove a valid assessment, such as would bind a bona fide purchaser for value of negotiable securities by constructive notice, nor was it conclusive of value, the county commissioners having the power to alter it, either by increasing or diminishing.

ID.—NEGOTIABLE INSTRUMENTS PAYABLE TO BEARER—PRESUMPTION. Where county bonds, regular on their face, and payable to bearer, were floated for value, and the interest coupons were produced, and admitted in evidence, in a suit to recover the interest due thereon, it was a prima facie presumption that the plaintiff was a holder of the coupons for value.

ID.—CONSTITUTIONALITY OF ACT FEBRUARY 1, 1872—BONA FIDE HOLDER— ESTOPPEL.—The legislature had the power to pass the act of February 1, 1872, authorizing the counties of the territory to issue bonds in aid of railroads, and conferring upon the counties and their officers the power to pass upon all the facts and conditions preliminary to the execution of such bonds, and where a bond, duly executed by a county, recites that it "is issued in full conformity to, and in compliance with, the statutes of the territory of New Mexico, empowering and authorizing counties to issue bonds to assist in the construction of railroads passing through all or any portion of said county," and has passed into the hands of a bona fide purchaser for value, the county is estopped from denying the validity of the bond on the ground of an overissue.

APPEAL, from a judgment in favor of plaintiff, from the First Judicial District Court, Santa Fe county. Judgment affirmed; FREEMAN, J., dissenting.

The facts are stated in the opinion of the court.

R. E. TWITCHELL, N. B. LAUGHLIN, THOMAS SMITH, NEILL B. FIELD, and GILDERSLEEVE & PRESTON for appellant.

Upon the declaration in this case, the question of the negotiability and negotiation of the coupons relied on is wholly immaterial. The plaintiff declared upon promises independent of and which were evidenced only by the coupons. Page v. Bank of Alexandria, 7 Wheat. 35; Hopkins v. Orr, 124 U. S. 513; Throop et al. v. Sherwood, 4 Gilm. (9 Ill.) 92; Duran v. Rogers, 71 Ill. 121; Hopper v. Covington, 118 U. S. 151; Cotton v. New Providence, 47 N. J. Law, 402; Blair v. Wilson, 28 Gratt. 165; Buzzell v. Snell, 25 N. H. 480; Cilley v. Jennesse, 2 Id. 89; Chapman v. Sloan, 2 Id. 467; Gamp v. Smith, 11 Id. 48; Morrison v. Bernards, 36 N. J. Law, 222.

Under such a declaration it was incumbent upon the plaintiff to show compliance with every antecedent requirement from which a promise by the county of Santa Fe could be implied, or if the promises relied on were express, the power of the person or persons making such promises, to bind the county thereby. Stout v. St. Louis Tribune Co., 52 Mo. 342; Gorman v. Judge, etc., 27 Mich. 139; Hannibal v. Fauntleroy, 105 U. S. 413.

"A county or municipal corporation acts wholly under delegated authority, and can exercise no power which is not in express terms or by necessary implication conferred upon it." Thompson v. Lee County, 70 U. S. 330.

If the plaintiff relied upon the proposition that the bonds and coupons were negotiable securities, and that he was a bona fide purchaser for value without notice, he should have declared specially upon the contracts, and alleged the existence of power in the county to issue such securities as well as the due execution of that power. And if he relied upon recitals in the bonds by way of estoppel he should have alleged the power and authority of the persons executing the instruments to make those recitals, and bind the county thereby.

Sheehy v. Mandeville, 7 Cranch, 215; Kennard v. Cass County, 3 Dill. 148; City v. Lamson, 9 Wall. 482; Hopper v. Covington, 10 Bin. 488.

The bonds were not negotiable securities, and the plaintiff could not have been a bona fide purchaser for value without notice, even had he filed a proper declaration, declaring specially upon the coupons, for the reasons, to wit: The bonds were signed by persons not authorized by law to execute them on behalf of the county; they bore a rate of interest in excess of the rate allowed by law; some of the bonds had coupons from July 1, 1881, extending over several years, attached at the time plaintiff acquired title to them; the bonds upon their face referred the purchaser to the act, under which they purported to have been issued. That act was notice to him of two limitations upon the power of the officers executing the bonds to bind the county, viz.: 1. That the bonds should not exceed five per cent of the assessed value of the taxable property of the county. 2. That the amount of bonds which would mature in any one year should not exceed two per centum upon such assessed valuation. The bonds contained no recital upon either proposition. School District v. Stone, 106 U. S. 185; Parkersburg v. Brown, 106 U. S. 501; Gaddis v. Richland Co., 92 Ill. 121; Green v. Dyersburg, 2 Flip. C. C. 477; Bissell v. Spring Valley Township, 110 U. S. 167; Dixon County v. Field, 111 Id. 83; Coler v. Cleburne, 131 U. S. 162; Buchanan v. Litchfield, 102 U. S. 278.

The plea of the six years' statute of limitations was well pleaded, and there was no evidence of an acknowledgment or of a new promise sufficient to avoid that plea. Daviess Co. v. Dickinson, 117 U. S. 657; Norton v. Shelby Co., 118 U. S. 426; Kelly v. Milan, 127 U. S. 139; Fort Scott v. Hickman, 112 Id. 150; Marsh v. Fulton Co., 10 Wall. 676.

The promise or acknowledgment, having been made before the bar of the statute had attached, was ineffectual for any purpose. It was not founded upon any new consideration, and our statute is silent as to the effect of a promise made before the bar of the statute has intervened. Courts can not ingraft upon a statute of limitations exceptions not contained in the statute itself. Fairbanks v. Dawson, 9 Cal. 90; Wilcox v. Williams, 5 Nev. 206; Case v. Cushman, 1 Pa. St. 245; Kirk v. Williams, 24 Fed. Rep. 446; Perry v. Ellis, 62 Miss. 711.

The plea of the four years' statute of limitations was well pleaded to the declaration as it stood. It could not be avoided by the replication that the action was founded on coupons or contracts in writing, which was a mere conclusion of law. The contracts declared on, not being alleged to be in writing, must, upon demurrer to the plea, be presumed to have been by parol. Wheeler v. West, 71 Cal. 126; Bank of Tenn. v. Armstrong, 12 Ark. 602; Calvert v. Lowell, 10 Id. 147; Roberts v. Albright, 2 Greene (Iowa), 120; Hubert v. Horter, 81 Pa. St. 39; Lapham v. Briggs, 27 Vt. 26; Carpenter v. McClure, 38 Vt. 376; Dana v. McClure, 39 Vt. 200; Throop et al. v. Sherwood, 4 Gilm. (9 Ill.) 92; 2 Greenl. Ev., sec. 127; Mitchell v. Allen, 28 Conn. 188; Langford v. Frieman, 60 Ind. 46.

It is now held that statutes of limitation are statutes of repose, and it is the duty of courts to give full effect to the legislative intent, which is to be derived solely from the language used. Clemenston v. Williams, 8 Cranch, 72; Bell v. Morrison, 1 Peters, 351; United States v. Wilder, 80 U. S. 254; Kirk v. Williams, 24 Fed. Rep. 446; Harris v. Howard, 56 Vt. 695.

The stipulation was not admissible in evidence— the admission of the existence of the facts therein stated was not an admission of the relevancy, competency, or materiality of such facts. By admitting such facts to

be true the parties only waived the production of legal evidence necessary to establish the existence of such facts; the question of their admissibility remained to be decided by the court as objections were interposed. Richardson v. Musser, 54 Cal. 196; Welsh v. Noyes, 10 Col. 145; Becker v. Lamont, 13 How. Pr. 33.

The stipulation could not confer jurisdiction upon the court to determine the liability of the county of Santa Fe upon coupons which accrued after the filing of the original declaration; it was to that extent void. Wright v. Hart, 44 Pa. St. 454; Wilbanks v. Willis, 2 Rich. (S. C.) 109; Stabb v. A. & P. R. R., 3 N. M. (Gil.) 606; State v. Turner, 96 N. C. 416; Etting v. Scott, 2 Johns. 157; Harrison v. Parker, 5 Litt. (Ky.) 250; Tompkins v. Ashby, Woody & W. 32; Bothingham v. Stevens, 1 Hall, 379.

The stipulation was void as to such coupons for the further reason that the amendment of the pleading stipulated for was never actually made. Ogden v. Lake View, 121 Ill. 422; Briggs v. Bruce, 9 Col. 282; Kimball v. Gerhard, 12 Cal. 45; Noonan v. Caledonian M. Co., 121 U. S. 393.

Judgment for an amount in excess of the ad damnum in the declaration was erroneous. Safford v. Weare, 142 Mass. 231.

The coupons are not incorporated into the pleadings so as to make it incumbent upon the defendant to deny under oath "the genuineness and due execution of the coupons." McCormick v. Bay City, 23 Mich. 457.

Neither the original nor a copy of any bond or coupon was filed by the plaintiff with the pleadings in which they were referred to. Secs. 1921, 1922, Comp. Laws; Hunley v. Willis, Lang & Co., 5 Por. Ala. 154; Chamberlain v. Darrington, 4 Id. 515.

The question presented by the issue whether the bonds in amount exceed five per cent of the assessed

valuation of the taxable property of Santa Fe county, and whether an amount exceeding two per cent of the assessed value of the property of the county became due in any one year on account of the bonds issued, was a question of fact, and when a fact exists, and the party upon whom rests the burden of establishing that fact offers the best evidence, no rule of law sanctions the exclusion of such evidence.  Williams v. Amory, 14 Mass. 30.

The mere failure to keep a record required by law to be kept, does not absolutely and in all cases exclude other proof of substantive facts "which might have been and ought to have been" recorded that might arise in the course of litigation.  If a record had been kept resort can not be had to secondary evidence, except under well settled rules, but if there never was a record in existence, evidence of an inferior character may be the best evidence and be admissible.  Bank of U. S. v. Dandridge, 12 Wheat. 64; Otto et al. v. Tramp, 115 Pa. St. 425; Davis v. Smith, 79 Me. 351; Leathers v. Cooley, 49 Id. 337; Co. Com'rs v. Brewington, 74 Ind. 7; Gillett v. Lyon Co., 18 Kan. 410; Williams v. School District, 21 Pick. 75.

The courts are not unanimous in sustaining the absolute necessity for an assessment roll technically correct in all its parts, even in cases involving the validity of tax titles.  Tory v. Milbury, 21 Pick. 64; Sibley v. Smith, 2 Mich. 499; 1 Black. Tax Tit., secs. 198, 199, and cases cited; Greenough v. Fulton Coal Co., 74 Pa. St. 498; Tweed v. Metcalf, 4 Mich. 579; People v. E. L. & Y. C. Co., 48 Cal. 144; McClure v. Warner, 16 Neb. 447; Fifield v. Marinette Co., 62 Wis. 540; Chestnut v. Elliot, 61 Miss. 569; State Auditor v. Jackson Co., 65 Ala. 142; Hall v. Helmer, 12 Neb. 87.

An assessment list is admissible in evidence, although the oath taken by the listers has not been

recorded as required by law. Day v. Peasley, 54 Ver. 310; Odiorne v. Rand, 59 N. H. 504; Norridgworch v. Walker, 71 Me. 181; Lowe v. Weld, 52 Id. 588; Johnson v. Goodridge, 15 Id. 31; Bangor v. Laney, 21 Id. 472; Tinsley v. Rusk Co., 42 Tex. 40.

Alterations upon the face of an assessment list are presumed to have been made by the person having the custody thereof, or by someone in his office having authority to do so, in the absence of any evidence to the contrary. Hommel v. Devint, 39 Mich. 523; State v. Manhattan Silver M. Co., 4 Neb. 318.

CATRON, KNAEBEL & CLANCY for appellee.

The action is upon coupons not under seal and properly laid in assumpsit. Pana v. Bowler, 107 U. S. 529.

The coupons, like promissory notes, and similar instruments, were admissible in evidence under the common money counts. Johnson County v. Stark, 24 Ill. 75, 93; Supervisors, etc., v. Hubbard, 45 Id. 139, 141; Ottowa v. National Bank, 105 U. S. 345; Nauvoo v. Ritter, 97 Id. 389; Hopkins v. Orr, 124 Id. 510.

The county having received money to the use of the plaintiff and converted the same to its own use is responsible under the common money counts for the conversion. It was competent for plaintiff to waive the tort, and sue as for money had and received. As against such a demand, the statute of limitation does not begin to run until the time of the conversion, and perhaps not until knowledge thereof is imputable to the plaintiff. Wood on Lim., pp. 381, 383.

"An acknowledgment or promise made before the statute has run vitalizes the old debt for another statutory period, dating from the time of the acknowledgment or promise, while an acknowledgment made after the statute has run gives a new cause of action,

for which the old debt is a consideration. The plaintiff may in the latter, but not in the former, declare upon the new promise." Wood on Lim., p. 201.

Although the declaration contained only the common money counts, the action was in part essentially "founded on written instruments," and, therefore, the six years' limitation was the only limitation relevant. Comp. Laws, sec. 1862; In Supervisors, etc., v. Hubbard, 45 Ill. 139. See, also, Lyon v. Bertram, 20 How. 149, 156.

The rights of the holders of the bonds and coupons in question must be determined by the law in force at the time of the inception of such securities, and that law is to be interpreted in the light of the then current decisions of the highest courts, in the place of the contract, and not by any subsequent change of judicial decision, to the prejudice of such holders. Louisiana v. Pilsbury, 105 U. S. 294, 295; Taylor v. Ypsilanti, 105 Id. 60, 71; Douglass v. County of Pike, 101 Id. 677, 687; Olcott v. Supervisors, 16 Wall. 678; Chicago v. Sheldon, 9 Wall. 50, 55, 60; The City v. Lamson, 9 Id. 477, 485, 486; Lee County v. Rogers, 7 Id. 181, 184; Thomson v. Lee County, 3 Id. 327, 330, 331; Havemeyer v. Iowa Co., Id. 294, 303; Goelpeck v. Dubuque, 1 Id. 175, 206; Ohio Life Ins. Trust Co. v. Debolt, 16 How. 431, 432; Shelby v. Guy, 11 Wheat. 367.

The bonds and coupons having been floated for value immediately upon their delivery by the county, every subsequent purchaser, whether he gave value or not, or whether he had notice of any infirmity or not, was clothed with the immunity of the assignor. Cromwell v. County of Sac, 96 U. S. 51.

Even a first purchaser for value can not be impeached as acting in bad faith merely because some of the interest accrued on the unmatured bonds is in

arrears, failure to pay interest not affecting the negotiability of that class of securities. Cromwell v. County of Sac, 96 U. S. 51; Town of Thomson v. Perine, 106 U. S. 589. See, also, Murray v. Lardner, 2 Wall. 110; Goodman v. Simonds, 20 How. 343; Collins v. Gilbert, 94 U. S. 753.

County bonds in aid of railroads have repeatedly been placed on the footing of negotiable securities, in respect of which the rights of bona fide holders are protected against hidden infirmities in the origin of the obligations. Lynde v. The County, 16 Wall. 6; Commissioners v. January, 94 U. S. 202; Commissioners v. Bolles, Id. 108; Town of Coloma v. Eaves, 92 Id. 484; Carroll Co. v. Smith, 111 Id. 556; Co. of Warren v. Marcy, 97 Id. 96; Harter v. Kernochan, 103 Id. 562. See, also, County of Macon v. Shores, 97 U. S. 272; Pana v. Bowler, 107 Id. 529; Ottowa v. National Bank, 105 Id. 343; Chambers County v. Clews, 21 Wall. 317; Supervisors v. Schenck, 5 Id. 772; Mayor v. Lord, 9 Id. 409; Goelpeck v. Dubuque, 1 Id. 203; Mercer County v. Hacket, Id. 83; Van Hortrup v. Madison City, Id. 291; Meyer v. City of Muscatine, Id. 384; Merchants Bank v. State Bank, 10 Id. 604; Pendleton County v. Amy, 11 Id. 304; St. Joseph Township v. Rogers, 16 Id. 644, 665; City of Lexington v. Butler, 14 Id. 282; San Antonio v. Mehaffy, 96 U. S. 312; Ring v. County of Johnson, 6 Iowa, 265; Buchanan v. Litchfield, 102 U. S. 278; Hopper v. Covington, 118 Id. 150; Nauvoo v. Ritter, 97 Id. 389.

As to distinction between cases involving a constitutional condition, and those, like ours, involving a mere statutory condition, see Lake County v. Graham, 130 U. S. 674.

By the revenue act of 1876, in force at the inception of the securities, the board of county commission-

ers was authorized to increase assessments made by the assessor.   Prince's Laws, p. 23.

The effect of the county commissioners' act of 1876, was to make the board of county commissioners of each county the successor of the probate judge, in respect of political administrative functions.   County of Kankakee v. Aetna Life Ins. Co., 106 U. S. 668; see, also, Comp. Laws, sec. 345.

It can not be set up against a bona fide holder that the amount of bonds issued was too large, in the face of the decision of the board and their recital that the bonds were issued pursuant to, and in compliance with, the act of 1872.   Humboldt Township v. Long, 92 U. S. 754; Dallas County v. McKenzie, 110 Id. 686, citing Marcy v. Oswego, 92 Id. 637, and Wilson v. Salamanca, 99 Id. 504, also Humboldt Township v. Long, supra; see, also, County of Moultrie v. Savings Bank, 92 U. S. 631; Venice v. Murdock, Id. 494; Town of Coloma v. Eaves, Id. 484, 486.

The clause in section 2709, Compiled Laws, leaving blank the rate of interest on bonds, is meaningless legislation, and should be rejected.   Leavitt v. Lovering, 15 Atl. Rep. (N. H.) 414; Hindekoper v. Douglass, 1 Cranch, 66; In re Water Com'rs, 66 N. Y. 414, 420, 421.

But the second section of the act (Comp. Laws, sec. 2710) provides that the proposition for railroad aid, to be submitted to the popular vote, shall specify "the rate of interest which has to be paid" conformably to the expressed intent of chapter 19 of the laws of the same session.   Under a well known rule, all the laws enacted at the same session of the legislature are to be taken as speaking from the same time, as in effect parts of one statute.   Sedg. Const. Stat. [2 Ed.], p. 68 citing Att'y Gen. v. Puget, 2 Price, 381; 2 Dwarris, 547.

In case of repugnancy in statutory clauses, the rule is, the last shall prevail, as showing the latest expression of the legislative will.   Sedg. Const. Stat. [2 Ed.],

p. 353; 10 Wend. 547; 7 Harris (Pa.), 211; Bacon, Ab. Stat. D.; Pond v. Maddox, 38 Cal. 572; U. S. v. Stern, 5 Blatch. C. C. 512.

The contemporaneous construction of a statute by those charged with its execution is not to be disregarded except for cogent reasons, and unless it be clear that such construction is erroneous. U. S. v. Johnston, 124 U. S. 236. See, also, U. S. v. Hill, 120 Id. 169; U. S. v. Philbrick, Id. 52; U. S. v. McDaniel, 7 Pet. 1; Slidell v. Grandjean, 111 U. S. 412; U. S. v. Moore, 95 U. S. 760; Brown v. U. S., 113 Id. 568; Hahn v. U. S., 107 Id. 402; Stuart v. Laird, 1 Cranch, 299; Martin v. Hunter, 1 Wheat. 304; Cohens v. Virginia, 6 Id. 264; Edwards v. Darby, 12 Id. 210; Union Ins. Co. v. Hoge, 21 How. 35; U. S. v. Alexander, 12 Wall. 177; Peabody v. Starke, 16 Id. 240; Smythe v. Fiske, 23 Id. 374; Cooper Mfg. Co. v. Ferguson, 113 U. S. 727.

The county by its repeated payments of interest, levies of taxes for that purpose, and its representations by its official records, upon the faith of which capital was induced to invest in its bonds and coupons, with the assurance that they were issued in conformity to law, is estopped from denying the validity of the issue. Third National Bank of Syracuse v. Town of Senaca Falls, 15 Fed. Rep. 783, 785; Anderson Co. Com'rs v. Beal, 113 U. S. 227; Com'rs of Johnson Co. v. January, 94 Id. 202–206; Pine Grove v. Talcott, 19 Wall. 678, 679; Whiting v. Town of Potter, 2 Fed. Rep. 517, 531; Pendleton Co. v. Amy, 13 Wall. 305; Supervisors v. Shenck, 5 Id. 772, 782; The President, etc., of Keithsburg v. Frick, 3 Ill. 405.

The pretended assessment "list," with its erasures, interpolations, and alterations, is competent for no purpose, whatever, and was properly rejected. 1 Greenl., Ev. 564; U. S. v. Linn, 1 How. 104; Angle v. N. W. M. L. I. Co., 92 U. S. 330.

The fact that it was not verified was fatal to its

admission. 1 Desty on Tax. 577, 581; Brevort v. Brooklyn, 89 N. Y. 128; Van Rensselaer v. Witbeck, 7 N. Y. 517; Westfall v. Preston, 49 Id. 349; Bellinger v. Gray, 51 Id. 610; Bradley v. Ward, 58 Id. 401; People v. Suffern, 68 Id. 321; Merritt v. Porchester, 71 Id. 309; Marsh v. Supervisors of Clark Co., 42 Wis. 502; Merriam v. Coffee, 16 Neb. 450; Morrill v. Taylor, 6 Id. 236; Cooley on Tax. 259, 289.

Attorneys of record in a pending cause have presumptively full authority to conduct the prosecution or defense according to their own discretion; and this authority includes even the right to submit the matter in controversy to arbitration. Holker v. Parker, 7 Cranch, 436; Mayor v. Foulkrod, 4 Wash. C. C. 511; see, also, Osborn v. U. S. Bank, 9 Wheat. 829; Hill v. Mendenhall, 21 Wall. 454; Pennsylvania v. Wheeling Bridge Co., 13 How. 560.

The judgment is enforcible by immediate taxation by the terms of the act out of which the securities arose. Ralls County v. U. S., 105 U. S. 733, 735, 738, and cases cited; also, Laughlin v. Co. Com'rs, 3 N. M. 421.

The county commissioners act of 1876 also makes specific provision for the collection of judgments against a county by a special levy for the purpose. Comp. Laws, sec. 338; Laughlin v. Co. Com'rs, 3 N. M. 421; Butz v. Muscatine, 8 Wall. 575; McCracken v. San Francisco, 16 Cal. 591.

As to the concluding clause providing for the execution of the judgment under the taxing power, it is merely declaratory of the applicable statutory provision, and does not, in any manner, add to the legal force and effect of the judgment. Comp. Laws, sec. 338; Laughlin v. Co. Com'rs, 3 N. M. 420.

The proper proceeding for the collection by tax of a judgment against a county is by writ of mandamus.

Ralls Co. Court v. U. S., 105 U. S. 733; East St. Louis v. Amy, 120 U. S. 600, 604.

McFIE, J.—This was a suit to recover the amount of overdue interest coupons on bonds issued by the appellant in aid of railroads. On the thirty-first of December, 1887, plantiff filed in the district court in and for Santa Fe county a declaration containing ten counts. Nine of the ten counts were special counts in substantially the same language, and setting forth that the cause of action arose upon a large number of interest coupons, the different numbers and amounts being set forth in the several special counts, copies of the interest coupons being attached to and filed with the declaration. A demurrer was sustained to all the special counts, and the plaintiff elected to go to trial on the remaining count of the declaration, the common money count, the bill of particulars, and the stipulation as amendatory thereto. The defendant demanded the filing of a bill of particulars, and the rule was discharged by the plaintiff, by referring to the coupons on file with the declaration as a sufficient bill of particulars. The defendant filed six pleas: First, the general issue; second, plea of four years' statute of limitation; third, plea of six years' statute of limitation; and the fourth, fifth, and sixth pleas set forth substantially that the promises and undertakings alleged by the plaintiff, if any such were made, were illegal and void for want of authority in the probate judge and the county commissioners of Santa Fe county to call or hold an election for the purpose of granting aid to railroads; that the amount of the bonds issued was excessive; that the bonds bore an unauthorized rate of interest; that the county had no authority to issue or deliver the bonds; that they were not issued in accordance with the vote of the people; that the recitals did not recite the conditions upon which the bonds were

voted; and that the railroad had not been constructed. The plaintiff joined issue on the first plea; replied to the second and third, in substance, that the obligations were not barred by the statute; and to the fourth, fifth, and sixth pleas of the defendant the plaintiff replied, in substance, that the action was founded upon coupons and contracts in writing for the payment of the interest upon certain bonds which on their face purported to be bonds of the county of Santa Fe, issued in full conformity to, and compliance with, the statutes of the territory of New Mexico, authorized by the vote of the qualified electors, and that the plaintiff had purchased said coupons for a valuable consideration, and without notice of the matters alleged in the defendant's pleas. Rejoinders to each of the replications filed by the plaintiff to the defendant's fourth, fifth, and sixth pleas were filed by the defendant, but demurrers were sustained to each of them, and the defendant afterward filed amended rejoinders, in which it substantially rejoined to each of the plaintiff's said replications, that the action was not founded upon certain coupons or contracts in writing, that the plaintiff did not purchase such coupons for a valuable consideration, and denied that the plaintiff purchased the same without notice. The plaintiff joined issue.

Before proceeding to the trial of the cause, and as bearing upon the question of pleading, a stipulation was filed as follows:

"William N. Coler, Jr., v. The Board of County Commissioners of Santa Fe County. In the district court, county of Santa Fe, July term, 1889.

"It is hereby stipulated by the respective parties to the above entitled action as follows: The defendant admits that bond number 45 produced by the plaintiff, is one of the bonds from which the coupons in question

are detached, said bonds being issued in several series, and all of them in form, tenor, and recitals substantially like said bond number 45. The pleadings, bill of particulars, and other proceedings shall be deemed and considered as hereby amended so as to embrace the plaintiff's claim on coupons clipped from the bonds aforesaid, to the amount of $19,915, of which $4,165 matured January 1, 1888; $5,250 matured July 1, 1888; $5,250, January 1, 1889; and $5,250 matured July 1, 1889, with the interest thereon from said several and respective dates of maturity, as well as the plaintiff's claim already specified in the papers on file herein, and also so as to conform to the facts as to the form and recitals of the said bonds, as hereinbefore referred to. The defendant also admits that the county of Santa Fe levied taxes for the years 1881, 1882, 1883, 1884, 1885, 1886, and 1887, expressly for the payment of the interest accruing in those years upon and according to the tenor of the bonds, to which the said coupons were attached; that such taxes amounted to $88,579; that of the proceeds of such taxes $36,400 were paid on account of the said interest, the said county upon such payment taking up and canceling coupons for a like amount, clipped from the said bonds; that a large sum of money, part of the proceeds of such taxation, was, by the said county, diverted from the purpose aforesaid for which it was raised and appropriated to other county purposes; that the levy of the said taxes in each of the said years is evidenced by the written records of said county, subscribed in its behalf by its county commissioners, and attested by the proper clerk; that the said bonds and attached coupons were, upon their delivery to, and acceptance by, the New Mexico & Southern Pacific Railroad Company, sold by that corporation for value, and purchased by divers persons, and in the year 1883, and from time to time

thereafter, the plaintiff acquired the said coupons and bonds for value.

> "R. E. TWITCHELL, District Attorney.
> "N. B. LAUGHLIN, THOMAS SMITH,
> "GILDERSLEEVE & PRESTON of Counsel.
> "CATRON, KNAEBEL & CLANCY,
>                     "Plaintiff's Attorneys."

Upon the issues thus made up the cause proceeded to trial on the sixteenth day of August, 1889. The trial resulted in a verdict for the plaintiff, under the instructions of the court, and a judgment was entered upon the verdict for the sum of $78,395.02. To reverse this judgment the appellant brings the cause to this court.

The legislative assembly for the territory of New Mexico, in the year 1872, passed an act to encourage the building of railroads in the territory of New Mexico, and authorizing the counties of the territory to issue bonds, or other evidence of debt, to aid in the construction of railroads, and to receive stock or other securities for the benefit of such counties. The act is as follows: "Chapter 30. An act authorizing counties to aid in the construction of railroads. Be it enacted by the legislative assembly of the territory of New Mexico: Section 1. That it shall be lawful for the people of any county in this territory to pledge the credit of such county to borrow money, to issue bonds or other evidences of debt, to assist in the construction of any railroad passing through all or a portion of said county, for such amount or amounts of money, not exceeding for any such road five per centum of the assessed value of the real and personal property of such county, as the electors of said county may determine in meetings or elections that may be held in the various precincts of such county for that purpose, and at said meetings or elections the terms and conditions of such pledge of credit may also be determined as hereinafter provided, in this act. The amount of bonds or other evi-

dences [of debt] that may become due in any year shall not exceed two per centum of the assessed value of the property of such county at the time of issuing such bonds or other evidences of debt. Nor shall the rate of interest upon such bonds or other evidence of debt be more than —— per centum per annum. Sec. 2. It shall be the duty of the probate judge or commissioner who may be hereafter provided by law, as the case may be, to call a meeting or election of the electors of the various precincts of said county who own taxable property, upon the written or printed, or in part written or printed, request of fifteen owners of property, electors and taxpayers of such county, which request shall specify the amount which has to be raised or pledged, and the manner of raising and pledging the same by bonds or otherwise, the rate of interest which has to be paid, the time or times of the payment, and such other matters as they may consider for the welfare and security of the people of the county, and in publishing notices of the meetings or elections to be held in such county there shall also be published with such notice a copy of the request and names upon the same, for which they call the meetings or elections. The questions submitted to the electors shall be those contained in the call for the meetings or elections, and those who vote upon the question of aid shall vote a ticket upon which is written or printed, or part written and part printed, the words, 'Aid for railroads, yes;' and those who vote in the negative shall vote a ticket on which is written or printed, or part written or printed, the words, 'Aid for railroads, no.' The elections or meetings to determine the question of aid shall be held at the usual places of voting in the precincts of the county, to be called in the same manner, at the same hours of the day the polls shall be opened, and shall be closed at the same time and manner, and the tickets shall be counted by the same inspectors and persons, and they shall make returns

of the same, certified, delivered, or returned in the same manner to all intents and purposes, as correct as is possible, as in the case of annual elections heretofore held for the election of officers, except that four notices of elections, printed in both languages, Spanish and English, shall be published at least fifteen days before the day of the election, in some conspicuous place in every and each precinct in the county, and shall be published in some periodical published in the county. Sec. 3. Should it be determined at such meetings or elections to aid in the construction of any railroad, and should it so appear from the proper returns of such meetings or elections held in such precincts as aforesaid, which returns shall be made, certified, and delivered by the proper inspectors, to the same person or persons, and in the same manner, that ordinary returns of election of county officers are certified, made, and delivered, within ten days after such meetings or elections are held, it shall be the duty of the probate judge of such county, or of any commissioner or commissioners who may by law be provided for, elected, or appointed for that purpose, to execute bonds or other evidences of debt, under their seal of office attested to by the clerk of the probate court, in conformity with the vote given at such elections or meetings of said county, and to require of the railroad company for whose benefit the aid has been voted such stock or other security for the same as can by such vote be required, as a condition precedent for the delivery of such bonds or other evidences of debt, and to do all other acts necessary to comply with the vote of the electors of such county, and all moneys, certificates, securities, or other things inuring to said county under this act, and by virtue of the conditions of such vote of said electors, shall be deposited with said probate judge or commissioners, as the case may be, and by him or them shall be kept in safety until delivered, in

conformity with the law, to the proper person at any time entitled thereto, or to the successor in office of said probate judge or commissioners as aforesaid. Sec. 4. It shall be the duty of the proper officer levying the usual taxes for territorial and county purposes, under the general law of taxation, to raise by taxation such sums of money, annually and from year to year, as may be sufficient from time to time to pay the principal and interest of such bonds or evidence of debt as regularly as the same shall become due, and in time to meet promptly the debt and interest: provided, that no bonds or other evidences of debt created under this act shall be sold for less than their par value; nor such bonds or other evidences of debt shall be paid or delivered to any railroad company, nor to any person or persons for the use of such company, nor shall they be permitted to leave the hands of said judge or commissioners, except upon the certificate of the governor that the railroad to which such aid has been conceded has been completed in the county where such aid was voted, whether it shall be entirely for such part of the county as the road has to pass, or in such proportion to all the distance agreeably to the amount of bonds or other evidences of debt delivered shall show to the whole sum voted. Sec. 5. This act shall take effect from and after its passage. Approved February 1, 1872."

In the year 1876, and prior to the issuing of the bonds and coupons in question in this case, the legislature of New Mexico passed what is known as the "County Commissioners' Act." By this act it was evidently intended that the government of the county should pass from the probate judge to the boards of county commissioners provided for by the act, and the following provisions of that act are cited in support of this view: Section 332, Comp. Laws: "Each organized county in this territory shall be a body corporate and politic, and as such shall be empowered for the following

purposes: * * * (4) To make all contracts and do all other acts in reference to the property and concerns necessary to the exercise of its corporate or administrative powers. (5) To exercise such other additional powers as may be specifically conferred by law." Sec. 334: "The powers of a county, as a body politic and corporate, shall be exercised by a board of county commissioners." Section 345. "The board of county commissioners shall have power at any session: * * * (2) To examine and settle all accounts of receipts and expenses of the county, and to examine and settle and allow all accounts chargeable against the county, and when so settled there may be issued county orders therefor, as provided by law. * * * (5) To represent the county and have the care of the county property, and the management of the interests of the county, in all cases where no other provision is made by law. * * * (8) To grant all licenses as may be provided by law, and every officer and person now required by law to make a return or render an account to the judges of probate, except in matters pertaining to probate, shall make and render the same to the various boards of county commissioners in the manner now required by law. (9) * * * The votes cast in any election shall be canvassed and counted within the time now prescribed by law, and the said boards of commissioners shall discharge all the duties and shall exercise all the powers now exer-- cised by the several probate judges relative to elections as now required by law, and shall be subject to the same penalties for any failure in the discharge of their duties and abuse or usurpation of power." Section 365: "All collectors, sheriffs, treasurers, clerks, constables, and all other persons responsible for money belonging to the county, shall render their accounts to settle with the board of county commissioners." * * *

The bonds from which the coupons sued on in this case were detached, were issued in professed conformity to the provisions of the act of 1872, above referred to, as modified by the provisions of the county commissioners' act of 1876. They were issued in several series. Each bond stated the number of bonds in the series of which such bond was a part. The bonds were for $1,000 each. The bonds do not show upon their face the total amount of the entire series, nor the value assessed, or otherwise, of the property of the county of Santa Fe. Every bond contained recitals declaring it to have been issued in pursuance of the proper statute. The recitals are in the following language, viz.: "This bond is one of a series of ―――― bonds, each of like tenor, date, and amount, and of like date of maturity, issued in payment of a concession of ―――― thousand dollars of bonds of the county of Santa Fe, payable thirty-four years after date, to assist in the construction of a railroad by the New Mexico and Southern Pacific Railroad Company, passing through a portion of said county of Santa Fe, in the territory of New Mexico, and is issued in full conformity to and compliance with the statutes of the territory of New Mexico, empowering and authorizing counties to issue bonds to assist in the construction of railroads passing through all or any portion of said county, having been duly authorized by vote of the qualified electors who own taxable property in said county of Santa Fe, at an election duly called and held on the fourth day of October, A. D. 1879, and the governor of the territory of New Mexico having duly certified that the railroad to which such aid has been ceded has been completed in said county of Santa Fe, in full compliance with the terms of such concessions. In witness whereof, the undersigned, the probate judge and the board of county commissioners of the county of Santa Fe, in the territory of New Mexico, pursuant

to and in full compliance with the statute in such case made and provided, have signed and executed this bond, and have caused the same to be attested by the clerk of the probate court of said county, an ex officio clerk of said board of county commissioners, under the seals of said probate court and of said board of county commissioners, this —— day of ——, 1880."

Each bond bore the county seal, and they were signed by the several county commissioners, the probate judge, and were attested by the probate clerk. It was unnecessary for the county commissioners and the probate judge to join in the execution. We are of the opinion that although at the time of the passage of the statute authorizing such bonds, only the probate judge was authorized to represent the county in the execution, yet the county commissioners' act of 1876, taken in connection with the railroad aid act of 1872, transferred the powers of the probate judge, under the last mentioned act, to the board of county commissioners. Kankakee Co. v. Aetna Life Ins. Co., 106 U. S. 668. We attach no importance to the fact that the probate judge united with the county commissioners in the proceeding.

Counsel for appellant insist that the fact that the probate judge signed the bonds was of itself notice of an irregularity in their issue, sufficient to put purchasers on inquiry; but we regard such fact as, suggesting only an inquiry as to why the probate judge so acted. The inquiry, if pursued, would have led only to a reading and interpretation of the statutes under which the proceedings were had, and the only inference which a purchaser could draw from the union of the several official signatures on the bonds would have been that they were employed to satisfy all the requirements of the statute in case it should be held that subsequent legislation did not divest the probate judge of his

*County bonds: execution by board: signate of probate judge: validity of issue.*

former functions respecting such proceedings. The purchaser, instead of being led to conclude that the numerous signatures were suspicious circumstances, would be impressed with the evident care taken to remove objections. In carrying out the provisions of the act of 1872 by issuing bonds as therein provided for, the act of the probate judge would have been the act of the county itself in its corporate capacity; but in carrying out the provisions of that act, by issuing bonds in aid of railroads authorized by that act after the passage of the county commissioners' act of 1876, we are of the opinion that the act of the county commissioners would be the act of the county itself in its corporate capacity; and therefore, at the time the bonds to which the coupons involved in this case were attached were issued, it was not necessary for the probate judge to attach his official signature to them, but that his signature was harmless surplusage, and vitiated nothing otherwise valid.

Counsel for appellant also claim that the bonds ought not to bear seven per cent interest, but should have drawn six per cent. This claim is based on an RATE of interest, imperfect clause in the first section of the legality of. act of 1872: "Nor shall the rate of interest upon such bonds or other evidences of debt be more than —— per centum per annum."

This clause is imperfect and meaningless, and the court can not by judicial construction fill the blank. It is unnecessary to examine the question of what, if any, significance should be given to the clause had it been the only provision concerning interest contained in the statute, for the next section clearly declares that the proposition to be submitted to the qualified electors should specify the rate of interest which is to be paid. This latter clause leaves the determination of the rate of interest to the people of the county. Here, the rule that, in case of repugnancy between statutory clauses,

the latter shall control, is of service. Following that rule, the definite clause in the second section must control the imperfect clause in the first section. This construction is also aided by the practical interpretation of the statute by the county officers for a series of years in dealing with the very bonds in question. The county, by the vote of the people, fixed seven per cent as the rate of interest, but that interest was afterward paid by taxes levied and collected during several consecutive years. Another statute, passed at the same session of the legislature as was the railroad aid act, abolished usury, and left all persons free to contract concerning the rate of interest. Chapter 19, Laws, 1872. The objection to the introduction of the coupons in evidence because they bore seven per cent interest was properly overruled. Six per cent interest only was computed upon coupons overdue.

Appellant insists that some of the coupons sued upon were barred by the statute of limitation, a matter which, if sustained, would go to the question of a reduction of the judgment. One batch of the coupons in question matured in the year 1881, more than six years before the commencement of the action; some others of the coupons matured more than four years before such commencement. The appellant pleaded both the six years' and the four years' statute of limitations, and insists that, the declaration being on the common counts only, the four years' period of the statute is applicable, and cites in support of such contention some cases in the Vermont reports. In our opinion, the action is essentially founded on written instruments, and therefore the four years' period of limitation is not applicable. The common counts in the declaration could be proven either by oral or by written promises. Lyon v. Bertram, 20 How. 140–156. A copy of one of the bonds was filed in the action as well as copies of the coupons,

Four years' limitation.

and these copies were also put into the case as part of the declaration by the appellee's bill of particulars. 1 Tidd, Pr., p. 599; Benedict v. Swain, 43 N. H. 34; and Nauvoo v. Ritter, 97 U. S. 391. The declaration and subsequent pleadings, read with the bill of particulars, show clearly that the coupons lay at the foundation of the action. This was the obvious, meritorious fact, and it is not to be overcome by the mere fiction of law that an implied promise was raised upon the express written promises. If the action was in one sense founded on the implied promise, it was in another sense also founded upon the underlying express promises upon which both the implied promise and the action itself were necessarily established. In Supervisors v. Hubbard, 45 Ill. 139, the common counts only were included in the declaration. The court treated the action as founded on the coupons involved. Moreover, the stipulation concedes, in effect, that the coupons lay at the foundation of the litigation. The stipulation, as well as the county's recognition of the bonds and coupons, sufficiently proves their due execution, even without resort to the statutory presumption. The coupons which matured in the year 1881 would be Six years' limita- barred but for two reasons: First, it is tion. stipulated that taxes were levied for the payment of those coupons; and, secondly, the board of county commissioners, before the six years' statute could attach, recognized the interest due on these bonds as a continuing liability. The county board at its regular session, June 7, 1886, passed a resolution in the following language:

"WHEREAS, it appears that there are not sufficient funds in the treasury of the county to meet the interest due on the bonds issued for the redemption of county warrants and bonds issued to the New Mexico & Southern Pacific Railroad Company, in aid of the con-

struction of the branch thereof, be it resolved, that the chairman of the county commissioners be, and he is hereby authorized to make the necessary loan in order to meet said interest when due, and said chairman is hereby authorized to issue a warrant for the payment of the interest on said loan.

"B. Seligman, Chairman.

"John Gray, Clerk."

This was a formal, official recognition of the bonds, as well as an admission of the obligation to pay the interest due on the bonds, and was provable both as an acknowledgment and as an account stated, under the common counts. The county board appears also to have admitted the accruing interest upon these county bonds at a session of the board held December 2, 1885. The county appears to have collected $88,579, proceeds of taxation, applicable to the payment of the interest coupons on the bonds in question, in the years 1881, 1882, 1883, 1884, 1885, 1886, and 1887, and $36,400 of the amount collected was in fact applied to the payment of the interest accruing on these bonds. Some of the interest money so levied by taxation appears to have been collected and diverted to other uses by the county. Enough appears to have been misappropriated to have paid the coupons which matured six years before the action. The precise time of such conversion does not appear in the case. If it was more than six years before the action, the appellant should have shown that fact. The amount was recoverable under the common counts, no objection being made on the trial of a variance between the proofs and the bill of particulars. It was also urged that the stipulation of the attorneys was ultra vires, and that notwithstanding the stipulation the coupons, amounting to $19,915, which matured after the filing of the declaration, could not be considered in the case. This

objection was not made in the court below, so far as
the record discloses, and is therefore not available here.
STIPULATION by    The stipulation is lawful on its face, and
attorneys,
validity of.      no application was made below for leave
to withdraw it. Every presumption of authority attends
the signatures of attorneys. Osborn v. U. S. Bank, 9
Wheat. 829; Hill v. Mendenhall, 21 Wall. 454. This
presumption would extend to a mere voluntary appear-
ance, and a voluntary appearance in a new action for
the recovery of the payment of additional coupons
would have had no higher efficacy than the stipulation
entered into in the pending action. It was not neces-
sary to interline or recopy the declaration so as to em-
brace the amendments. The stipulation imported an
immediate amendment by force of its own terms, and
the amendment, being specific in character, and not
general, was perfectly regular. Walden's Lessee v.
Craig's Heirs, 14 Pet. 147. The stipulation was ad-
mitted in evidence by the court below, and we think
properly so. When it was offered, a general, but not
specific, objection was made to its introduction; but an
examination of the record discloses the fact that at no
time during the trial of the cause was it suggested that
the stipulation did not recite facts. Indeed, it was
admitted by the appellant that the stipulation correctly
stated facts. On page 59 of the record, Mr. Preston,
one of the counsel for appellant who signed this stipu-
lation, said: "We admit that the matters contained
in the stipulation are facts, but deny that they are
proper evidence." Mr. Smith, also of counsel for
appellant, and who signed the stipulation, says on page
59 of the record: "We admit it to be a fact that taxes
were levied for the payment of these bonds. The
moment it shall be attempted to introduce that fact in
evidence we will object, because we think it is imma-
terial. By admitting that this bond is a sample of the
others, we do not admit that this bond is properly

admissible in evidence. We admit that taxes were levied, but deny that it is proper evidence." This stipulation was signed by counsel regularly employed by the county of Santa Fe, as shown by the record, and the recorded proceedings of the board of county commissioners for Santa Fe county. It was also signed by the legal representative of the county, the district attorney, and the evident purpose was to simplify the issues by the admission of existing facts; and we see no reason why the defendant should be relieved from admitting the truth and the actual facts as they existed at the time the stipulation was entered into. This stipulation was evidently intended to remove from the case technicalities, in order that the cause might be tried upon its merits; the real purpose being to determine whether the bonds of the county were valid or void. Hence the stipulation provides that the pleadings should be considered as "hereby amended" so as to embrace all the coupons due up to the time of the trial, it being immaterial to the appellant, the amount of the judgment not exceeding amount due, if the bonds and the coupons sued on were held to be valid obligations of the county. Therefore a technical examination of the pleadings in the cause seems to have been unnecessary, either in the court below or in this court. This court has already indicated its unwillingness to encourage technical objections respecting pleadings when made for the first time on appeal, after the parties have gone to trial acquiescently on an assumed issue of facts, holding that even the entire absence of a plea is immaterial, if the defendant goes to trial and controverts the plaintiff's claim by proof. We take notice of the fact that counsel who signed the stipulation in the court below are counsel in this court in this case, which, at least, suggests that counsel are not liable to the charge of having misrepresented the county in signing the stipulation. "The appearance of a regularly licensed

practitioner of a chancery court is always received as
evidence of his authority, and this although he acts for
a corporation." Osborn v. U. S. Bank, 9 Wheat. 829.
"A record which shows an appearance by an attorney
will bind the party until it is proven that the attorney
acted without authority." Hill v. Mendenhall, 21
Wall. 454. "The authority of the attorney general of
a state is presumed." Pennsylvania v. Wheeling
Bridge Co., 13 How. 519. We see no reason why the
principle in this case does not apply to the district
attorney or legal representative of a county.

It is insisted by the appellant that the court erred
in admitting the coupons in evidence in the court below.
We have already disposed of this objection,
in so far as to hold that the coupons lay
at the foundation of the action, and that
the action was therefore founded upon written instru-
ments, which may be received in evidence under the
common money counts. By the pleadings, the bill of
particulars, and the stipulation it is undoubted that
the coupons were the real cause of action in this case.
There was no plea denying under oath the execution
of the instruments sued on, and hence they were admis-
sible in evidence without any further proof of their exe-
cution, under the provisions of the Compiled Laws of
New Mexico. One of the bonds was admitted in evi-
dence, not because it was really a part of the cause of
action, but it was properly admissible as furnishing
the substratum on which the coupons rested. Super-
visors v. Hubbard, 45 Ill. 141.

Proceeding, then, to the consideration of the main
issue, the fundamental questions in this case are—First,
whether the bonds to which the coupons sued on were
attached were illegal in their inception; and, secondly,
whether such illegality, if it existed, is available as a
defense against the appellee. If the county
of Santa Fe was utterly without power to
issue the bonds, the bonds are bad, no matter into

*Marginal notes:* INTEREST coupons: admissibility of. BONA fide holder: burden of proof.

whose hands they may have passed.   The utmost good faith could not avail a purchaser in such a case.   But, if the bonds were issued within the apparent scope of a lawful power, and their recitals import the performance of all the conditions precedent, then irregularities in the exercise of the power, although they might perhaps have avoided the bonds as between the county and the railroad company, afford no defense against a subsequent bona fide holder.   In such case, the county, as against one presumed by law to be a bona fide holder, must, by affirmative proof bring home to him knowledge of the irregularities in order to avoid the securities.   The bonds state on their face the purpose for which they were issued, and that purpose being a legal one, and the recitals being ample in their showing of compliance with the law, they must be considered negotiable securities, not impeachable in the hands of bona fide holders except for want of jurisdiction in the board of county commissioners.   The appellant insists that upon the trial it offered to show absolute want of power in the county to issue the bonds, but was prevented from making that showing by the erroneous ruling of the trial court.   The essential point made is that the county was prohibited by law from issuing bonds of the kind in question in an amount exceeding five per cent of the assessed value of the property of the county, and, on account of the terms of the stipulation of the attorneys filed in the cause, this point is supplemented by the criticism that, assuming all the bonds to be in terms like the one produced and referred to in the stipulation, they must all come due in the same year, namely, thirty-four years from date, and that thus the amount of principal payable in one year would exceed two per centum of the assessed value of the property of the county at the time of issuing the bonds, contrary to a further prohibition of the first

NEGOTIABILITY of bonds in hands of bona fide holder.

section of the statute. A reference to the terms of the

STIPULATION:    stipulation does not sustain the latter point.
presumption.    The stipulation recites that the bond number 45 is one of the bonds from which the coupons were detached, the said bonds being issued in several series, and all of them in "form, tenor, and recitals substantially like the said bond number 45." It is not stipulated that they are dated alike, nor that they mature at the same time; it is stated that they were in several series. The presumption is that the bonds were legally issued; therefore that the different series matured in different years, so as to be within the terms of the statute. But these propositions both involve the same legal principle. If the proceedings looking to the county aid contemplated an overissue of the bonds, and no representations by recitals could protect an innocent purchaser, of course the bonds would be void, and the coupons fall with them. The real objection of the county to the payment of the bonds is found right here in the case. Great ability has been shown by counsel in pressing this subject upon the attention of the court, and we have given it great consideration. We have come to the conclusion, however, that, even were the objection that there was an overissue not otherwise untenable, the county failed at the trial to tender legal evidence of the assessed value of the property of the county at the time the bonds originat-

ASSESSMENT:    ed. It seemed to have been assumed by the
evidence.    counsel for the county at the trial that the assessed value to be proved was the last assessment for purposes of taxation prior to the railroad aid proceedings, and they accordingly produced what purported to be the assessor's register, or list of assessments for the year 1879; but that book contained erasures, interpolations, alterations, and was objected to on that as well as other grounds. Besides, it was not certified or verified, as required by law, at the

time.  Prince, St., p. 534.  If the railroad aid act
referred to the last assessment for purposes of taxation,
it intended a valid assessment, not a vague, unofficial,
illegal document or book.  An assessment is a serious
thing.  It exists only pursuant to law.  A pretended
assessment, made in defiance of law, is no assessment
at all.  1 Desty, Tax'n, pp. 557–581; Cooley, Tax'n,
259–289.  The book of assessments made by the asses-
sor in the year 1879, offered on the trial below, being
mutilated, and unverified or certified as required by
law, was not a valid assessment, and the court was
warranted in making that one of the reasons for its
rejection as evidence in the case, for the reason that
such a record was incompetent to prove a valid assess-
ment, such as would bind a bona fide purchaser for
value of negotiable securities, upon the principle of
constructive notice, nor was it conclusive of value, as
the county commissioners had power to alter it, either
by increasing or diminishing.  The case mainly relied
on by the appellant, that of Dixon Co. v. Field, 111
U. S. 83, is based upon the theory that an assessment,
such as referred to in the Nebraska constitution, is a
record of which all the world has constructive notice.
The court in its opinion refers to two factors present
to the purchaser in that case,—one, the assessment, of
which he had constructive notice by the record; the
other, the extent of the county indebtedness occasioned
by the bonds of which he had actual notice by the
statement of the total amount of such indebtedness
upon the face of each bond.  The validity of the
record and total amount of the assessment in that case
was unquestioned, and, each bond showing upon its
face the total amount of the issue, it became simply a
matter of arithmetical calculation on the part of the
purchaser, and which the purchaser was bound to
make, to demonstrate the invalidity of the bonds.
The reasoning in that case has no application to a pre-

tended assessment, unverified and uncertified, as required by law, and one which can not operate as constructive notice any better than an unlawfully recorded deed of real estate. We thus find, even if the principle of the Dixon County case could be effective under such a statute as that in question here, it could not be in the absence of proof of a lawful assessment of record. It is not to be inferred from anything said in the opinion of the court in that case, that, in the absence of constructive notice by a lawful record, a purchaser of municipal bonds, containing recitals as broad as these appearing here, is put upon inquiry as to the actual amount of taxable property in a county, and of every fact (aliunde) which might properly be considered by an assessor or by a board of commissioners in coming to a determination or estimate on the subject of taxable values. Such facts are proper to be considered by the county officials in forming their own conclusions as to the amount of taxable property, but the bond purchaser is not called upon to exercise his judgment upon that. This is certainly the effect of the decision in Marcy v. Township of Oswego, 92 U. S. 637, and in many other similar cases.

In the case of Dixon Co. v. Field, 111 U. S. 83, the facts are essentially different from those of the case here. The statute of Nebraska, authorizing donations to be made to railroads, authorized the issue of bonds to an amount not exceeding ten per cent of the assessed valuation of all the taxable property in the county, with the proviso requiring submission of the question of issuing bonds to a vote of the legal voters for the county in the manner provided by law. That act of the legislature was afterward amended on the seventeenth day of February, 1875, so as to require a two thirds majority of the votes cast at the election, instead of a mere majority, to authorize the issuance of bonds. It will be observed that the statute prohibi-

ted the issue of bonds exceeding in amount ten per
cent of the taxable value of the property in the county.
The constitution of Nebraska took effect November 1,
1875.   The constitution followed the statute by author-
izing donations to railroads, authorized by a. vote of
the electors.   In its first proviso it restricted such
donations to not exceeding ten per cent of the assessed
valuation of such county, but in the second proviso to
the constitution there was this provision:   "That any
city or county may, by a two thirds vote, increase such
indebtedness five per cent in addition to such ten per
cent; and no bonds or other evidences of indebtedness
so issued shall be valid unless the same shall have
indorsed thereon a certificate signed by the secretary
and auditor of state, showing the same is issued pursu-
ant to law."   The county of Dixon issued bonds ex-
ceeding ten per cent of the admitted assessed valua-
uation of the property of the county, but less than fif-
teen per cent; and upon the trial it was insisted that,
although the statute only authorized the issuing of
bonds to the extent of ten per cent of the assessed val-
uation of the property of Dixon county, the constitu-
tion by its second proviso had the effect of enlarging
the statute by construction, and thereby legalized the
issuing of bonds in excess of the limit prescribed by
the statute.   The court held in that case that the
adoption of the constitution had no such effect, and
refused to give it the construction asked for, in sup-
port of the bonds; holding that the object of the con-
stitutional amendment was to restrict and prohibit,
rather than enlarge, the powers conferred by the stat-
ute of Nebraska.   In this case there is no restrictive
or prohibitive constitutional provision.   The powers
granted the county of Santa Fe in this case were pure-
ly statutory, and this case clearly falls within the prin-
ciple of the numerous cases decided by the supreme
court of the United States, where bonds were issued in

professed conformity to statutory enactments. It will also be observed that in this case the statute does not restrict the county to the granting of aid or subscription for stock to one railroad.

The appellant erroneously assumes that the five per cent limit relates to the amount of aid extended to any railroad corporation, whereas the statute uses the word "railroad," cualquiera ferrocarril. The statute deals with the subject of aid to construction, or to a railroad, as aid to a definite, tangible thing in rem, rather than aid to a corporation as such. Consistently with the statute, the same corporation which had secured five per cent of aid in the construction of one road might lawfully receive aid in the construction of another road, it being plain that the statute permitted five per cent of aid to the construction of a road by one company, and, also, a like amount of aid in the construction of another road; but, on principle, it makes no difference whether the various roads are constructed by one or several companies. In either case, the county gets the benefit of the railroad improvement in increased facilities for trade and communication, increased population, and increased amount of taxable estate within its jurisdiction; which, undoubtedly, was the object sought to be obtained by the legislature in the passage of the railroad aid act. It accorded aid to the building of railroads, regardless of the owners. In the case of County Com'rs of Santa Fe Co. v. New Mexico & S. P. R. Co., 3 N. M. 120, in considering the validity of a statute of New Mexico exempting railroad property from taxation for six years after completion, Judge BRISTOL, in delivering the opinion of the court, used the following language, which we deem equally applicable to the present case, as the statute should be construed according to its intent as well as its language: "At that time the territory of New Mexico was the most inaccessible portion of the dominion of the United

States to enterprise and commerce. Every branch of industry was languishing, as it had been for centuries, for lack of cheap and rapid transportation to the leading marts of the country. To expend millions in constructing long lines of railway to and through this remote region was a hazardous undertaking; an experiment; a venture which any but the boldest minds would readily shrink from. At that date not a foot of railroad had been constructed anywhere within the borders of New Mexico. It was under this condition of things that the territory, through its legislative assembly, made a bid for railroads under fair and explicit terms, and upon a consideration of great public importance. As plainly as it could be expressed by acts of the legislative assembly the territory said to all railroad corporations then existing under the laws of the territory, or thereafter to be organized under such laws, that, in consideration of the public benefits to be derived from the construction and operation of railroads within the territory, upon the completion of any such railroad by any such corporation, its corporate property therein and connected therewith shall be exempt from taxation for six years after such completion." Again, the record discloses the reason why the bonds in this case were authorized to be issued in series, and that there were in fact several series, in that the act evidently contemplated that the bonds might be issued and delivered at different times as the construction progressed. Each bond issued bore upon its face the number of bonds in the series only, and not the entire number of bonds issued in the several series. And it may be further observed that neither of the series issued exceeded in amount the statutory limit, admitting that there was a valid record of the assessed value, and that the purchaser was chargeable with notice of that record. In this case the purchaser of one of the bonds, in any one of the series, could not ascertain

or determine, by comparing it with the assessed value of the property of the county of Santa Fe, that there had been an overissue of such bonds, or that they had not been issued in strict conformity to the law under which they professed upon their face to have been issued. There is a marked difference between this case and the case of Dixon Co. v. Field, in this respect. In the case of Dixon county each bond showed the entire amount of the bonds issued ($87,000), and the purchaser, having the assessed value of the property of Dixon county in one hand, and in the other one of the bonds issued by the county, could ascertain in a moment that there had been an overissue, and consequently an absence of power in the county to issue them. The two factors in the case of Dixon county against Field were necessarily before the purchaser of the bonds, even in the open market, but the two factors were not present to the purchaser in the open market of the bonds in this case; and more especially is this true when it is admitted by the stipulation that these bonds, and the coupons attached to them, "were, upon their delivery to, and acceptance by, the New Mexico & Southern Pacific Railroad Company, sold by that corporation for value, and purchased by divers persons; and in the year 1883, and from time to time thereafter, the plaintiff acquired the said coupons and bonds for value."

It will be observed that the electors of the county were clothed with the power to determine the conditions precedent to the issuance of the bonds, except as to the result of the vote, at the election to be held; whether aid shall be given to any railroad or not, and, if so, to what extent, when payable, and the rate of interest, the points from which and to which the railroad shall be constructed, and the terms upon which the aid is granted; and, if the electors so determine, the law further declares, that it "shall be the duty of the probate judge, commissioner, or commissioners," or, in

other words, the legally constituted authorities of the county, who were clothed with the power to determine the result of the vote, to issue the aid as determined by the vote. The law further provides that the authorities of the county whose duty it was to issue the bonds, shall deliver them upon the certificate of the governor as to the completion of part or all of the road, and they shall have the power to require of the railroad company constructing the road, in consideration of the delivery of such bonds, such an amount of stock or other security as may be deemed for the welfare or security of the county. The record discloses that the propositions were submitted upon the request of fifteen owners of property, electors, and taxpayers of the county; and there appears to be no question as to the legality of the elections or the result of the vote, nor that the bonds were issued in conformity to the result of said elections, in the amount, time of payment, interest to be paid, etc. Two separate propositions, two different railroads, constructed from different points within the county, were submitted and voted upon. The certificates of the governor are shown in the record of the completion of different portions of the road, at different times; these certificates having been made evidently for the purpose of authorizing the delivery of the bonds for the portions of the road constructed. The act provided that the bonds should be delivered to the railroad company constructing the road, and, in the absence of any proof to the contrary, it must be assumed that they were so delivered; nor is it disclosed by the record that the plaintiff in this case was in any way connected with the railroad company that received the bonds, nor that he had any knowledge of the bonds or coupons in NEGOTIABLE in- question, except such as the law imputed struments paya- ble to bearer: to him. It is a general rule that when prima facie presumption. the holder of a negotiable instrument regular on its face and payable to bearer produces it in a

suit to recover its contents, and the same has been received in evidence, that is a prima facie presumption that he became the holder of it for value at its date, and in the usual course of business. 2 Wall. 110; 22 How. 96; 94 U. S. 753; 95 U. S. 474. "Municipal bonds payable to bearer are subject to the same rules as other negotiable paper." Pana v. Bowler, 107 U. S. 529. In the present case there is nothing to rebut the presumption arising from the production of the coupons, that the plaintiff was the prima facie holder of them for value. The bonds and coupons having been floated for value immediately upon their delivery by the county, every subsequent purchaser, whether or not he gave value, whether or not he had notice of any infirmity in the origin of the securities, was clothed with the immunity of his assignor; and even the first purchaser for value can not be impeached as acting mala fides, merely because some of the interest accrued on unmatured bonds is in arrears, failure to pay interest not affecting the negotiability of that class of securities. Obligations of municipalities in the form of those in suit here are placed by numerous decisions of the supreme court of the United States court on the footing of negotiable paper. Cromwell v. County of Sac, 96 U. S. 51.

Coupon bonds of the ordinary kind, payable to bearer, pass by delivery, and a purchaser of them in good faith is not affected by want of title in the vendor. The burden of proof on a question of such faith lies on the party who assails the possession. Possession of such paper carries the title with it to the holder. Possession and title are one and inseparable. Murray v. Lardner, 2 Wall. 121. The plaintiff was the bona fide holder for value of the coupons sued on in this case, and the only defense available for the appellant in this case was the absolute want of power in the corporate authority of the county of Santa Fe to issue the

bonds and the coupons involved in this suit.   In Town of Coloma v. Eaves, 92 U. S. 484, it is held that, "where it may be gathered from the legislative enactment that the officers of the municipality are invested with the power to decide whether the condition precedent has been complied with, their recital that it has been made upon the bonds issued by them, and held by a bona fide purchaser, is conclusive of the fact and binding upon the municipality; for the recital is itself a decision of the fact by the appointed tribunal," the real question involved being whether in the particular case under consideration a fair construction of the law authorized the officers issuing the bonds to ascertain, determine, and certify the existence of the facts upon which their power, by the terms of the law, was made to depend.

That there was a clear and explicit legislative enactment authorizing the county of Santa Fe to issue bonds in the aid of the construction of railroads constructed within the limits of the county, at the time the bonds and coupons involved in this case were issued, there can be no serious question.   By the provisions of the railroad aid act the county itself, by a vote of its properly qualified electors, was clothed with the power to determine in what manner and to what extent aid should be given to the constructions of railroads within the county.   The law provides that in the proclamations of election all of the propositions to be voted upon and determined by the electors shall be stated and published, the total amount to be issued, the time of payment, the rate of interest, the railroad to which aid is to be granted, and all other matters necessary to fully inform the elector of the matters to be determined by the vote of the people.   The county itself, through its electors, determined all questions precedent to the issuing of the bonds, and it then became the duty of the corporate authorities of the county, which at that

time was the board of county commissioners, to carry out the provisions of the law, and to issue the bonds provided for by the vote of the people. The corporate authorities represent the county, and their act is the act of the county itself, to the extent of its corporate powers, and the people put in motion .the machinery that compelled the corporate authorities to act, to the extent of issuing the bonds involved in this proceeding. In this way the bonds originated, and, so far as the record discloses, no effort was ever made to prevent their issuance or delivery to the railroad company, or prevent their being negotiated, and in that way they became commercial paper upon the open market. The bonds being lawful and negotiable on their face, and the appellee and the prior purchasers who bought them when they were sold by the railroad. company upon their delivery to the company by the county being entitled to the presumption protecting innocent holders of commercial paper, the appellant without showing, or offering to show, that the appellee's assignors were cognizant of any irregularities, could not be permitted to prove them on the trial, unless they indicated absolute want of power in the county.

We consider the defense, and evidence in support of it, tendered by the appellant, to show the alleged want of power, to have been incompetent. But suppose that the rejected evidence had been admitted, how could it have helped the appellant? No constitutional limitation is involved in this case. In New Mexico it was perfectly competent for the legislature to confer upon the county and its officers the power to pass upon all the facts and conditions preliminary to the execution of the bonds. The supreme court of the United States still adheres to the doctrine of the cases of Town of Coloma v. Eaves, 92 U. S. 484; Marcy v. Township of Oswego, 92 U. S. 637; Humboldt Tp. v. Long, Id.

CONSTITUTIONAL-
ITY of act Febru-
ary 1, 1872: bona
fide holder:
estoppel.

642; Wilson v. Salamanca, 99 U. S. 504; Dallas Co. v.
McKenzie, 110 U. S. 680, and other similar decisions,
by which it was held that the railroad aid statutes sim-
ilar to the New Mexico statute conferred by implica-
tion upon the county or township officials the power to
consider and adjudicate all such preliminary matters,
and to recite their determination on the bonds in terms
creating an estoppel against the county or municipality.
The language used in the opinion of the court in Com-
anche Co. v. Lewis, 133 U. S. 206, is applicable to the
recitals on the bonds in question.   In that opinion Mr.
Justice BREWER says:   "The recital that the bond was
executed and issued in pursuance of, and in accordance
with, that act [the authorizing statute], and also in
accordance with the vote of the majority of the quali-
fied electors, is, within the repeated rulings of this
court, sufficient to validate the bonds in the hands of a
bona fide holder."   In the case of Township of Ber-
nards v. Morrison, decided March 3, 1890, and reported
in 10 Sup. Ct. Rep. No. 17, p. 333, the court says, by Mr.
Justice BREWER: "It were useless to refer to the long list
of cases in which recitals like these have been held suffi-
cient to sustain bonds in the hands of bona fide holders.
While it is true that the act does not in terms say that
these commissioners had the right to decide that all the
preliminary conditions have been complied with, yet
such express direction and authority is seldom found in
acts providing for the issuing of bonds.   It is enough
that full control in the matter is given to the officers
named."   In the case of Oregon v. Jennings, 119 U. S.
74–92, the rule is thus stated by Mr. Justice BLATCH-
FORD:   "Within the numerous decisions of this court
on the subject, the supervisor and the town clerk, they
being named in the statute as the officers to sign the
bonds, and the corporate authorities to act for the town
in issuing them to the company, were the persons
intrusted with the duty of deciding, before issuing the

bonds, whether the conditions determined at the elec-
tion existed, and then certify to that effect in the bonds.
The town is estopped from asserting, as against a bona
fide holder, that the conditions prescribed by the pop-
ular vote were not complied with.   Whatever may be
the hardships of this particular case, to sustain the
defendants would go far toward destroying the market
value of municipal bonds." Several of the cases above
cited expressly hold that under such statutes the
defense of an overissue can not be set up against such
recitals.   The Dallas County Case, 110 U. S. 686, was
decided almost at the same time with the Dixon county
case, and it follows the prior cases on the subject, the
chief justice saying that "in those cases it was expressly
decided that municipal bonds were not invalid in the
hands of a bona fide holder, by reason of their having
been voted and issued in excess of the statutory limit,
if the recitals imported a valid issue." In Supervisors
v. Schenck, 5 Wall. 772, in giving the opinion of the
court, Mr. Justice CLIFFORD says:   "Argument of the
defense proceeds upon the ground that, if they can
show that the order for the election emanated from the
wrong source, the plaintiff, although an innocent holder
for value can not recover; but it is clear that in a case
like the present, where the power to issue bonds was
fully vested in the corporation, the proposition can not
be sustained.   On the contrary, it is settled law that a
negotiable security of a corporation, which upon its
face appears to have been duly issued by such corpora-
tion, in conformity with the provisions of its charter,
is valid in the hands of a bona fide holder thereof with-
out notice, although such security was in point of fact
issued for a purpose and at a place not authorized by
the charter of the corporation." In Mayor v. Lord, 9
Wall. 409, Mr. Justice SWAYNE said: "In that event, if
the bonds could have been properly issued under any
circumstances, he [an innocent purchaser] had a right

to presume they were so issued, and as against him the city is estopped to deny their validity." . In Mercer County Case, 1 Wall. 92, 93, Mr. Justice GRIER says: "The bonds declare on their face that the faith and credit and property of the county are solemnly pledged under the authority of certain acts of the assembly, and that in pursuance of said acts the bonds were signed by the commissioners of the county. They are on their face a complete and perfect exhibit, no defect in form or substance, and the evidence offered is to show the recitals on the bonds are not true; not that no law exists to authorize their issue, but that the bonds were not made in pursuance of the acts of the assembly authorizing them." In the case of Commissioners of Knox v. Aspinwall, 21 How. 545, it is said that "where the bonds on their face import compliance with the law under which they were issued, the purchaser is not bound to look further. The decision of the board of county commissioners may not be conclusive in a direct proceeding to inquire into the facts before the rights and interests of the parties had attached, but, after the authority has been executed, the stock subscribed, and the bonds issued, and in the hands of innocent holders, it would be too late, even in a direct proceeding, to call it in question. These securities are treated as negotiable in the commercial usages of the civilized world, and have received the sanction of judicial recognition. Although we doubt not the facts stated as to the atrocious frauds which have been practiced in some counties in issuing and obtaining these bonds, we can not agree to overrule our own decisions, and change the law to suit hard cases." In City of Lexington v. Butler, 14 Wall. 282, the court say: "The repeated decisions of this court have established the rule that, when a corporation has power, under any circumstances, to issue negotiable securities, the bona fide holder has a right to presume that they were issued

under the circumstances which gave the requisite authority, and that they are no more liable to be impeached for any infirmity in the hands of such a holder than any other commercial paper." In San Antonio v. Mehaffy, 96 U. S. 312, the court said: "The holder of commercial paper, in the absence of proof to the contrary, is presumed to have taken it underdue, for a valuable consideration, and without notice of any objection to which it was liable. This shuts the door, as a matter of law, to all inquiry touching the regularity of the proceedings of the officers charged with the duty of subscribing and making payment in the way prescribed. The rule in such case is that, if the municipality could have had the power, under any circumstances, to issue the securities, the bona fide holder has the right to presume that they were issued under the circumstances which gave the authority, and they are no more liable to be impeached in his hands for any infirmity than any other commercial paper."

Three cases have been cited by the appellant, and apparently relied ·upon, in support of the proposition that the recitals do not work an estoppel. In each of the cases a constitutional limitation was involved. In the case of Buchanan v. City of Litchfield, 102 U. S., the bonds contained no estopping recitals, and did not even contain a statement of the purpose for which they were issued. Hence, the court said in that case that, "when a municipal bond does not bear upon its face a statement of the lawful purpose for which it was issued, or recitals estopping the municipality, it is necessary for the plaintiff, in a suit upon the bonds, or upon the interest coupons, to aver and prove that they were issued under legislative authority, and in the mode and for the purposes provided by law." The case of Dixon Co. v. Field we have already referred to. The third case, Lake Co. v. Graham, 130 U. S. 674, also involved a constitutional limitation. In the opinion of the court

it is said: "The question here is distinguishable from that in the cases relied on by the counsel for the defendant in error. In this case the standard of validity is created by the constitution. In this standard two factors are to be considered—one the amount of the assessed value; and the other the ratio between the assessed value and the debt proposed. These being the exactions of the constitution itself, it is not within the power of the legislature to dispense with them, either directly or indirectly, by the creation of a ministerial commission whose findings shall be taken in lieu of the facts. In the case of Sherman Co. v. Simon, 109 U. S. 735, and others like it, the question was one of estoppel, as against the exaction imposed by the legislature; and the holding was that the legislature, being the source of the exaction, had created a board authorized to determine whether its exaction had been complied with, and that its finding was conclusive to a bona fide purchaser. So, also, in Oregon v. Jennings, 119 U. S. 74, the condition violated was not one imposed by the constitution, but one fixed by the subscription contract of the people." In the case of Potter v. Chaffee Co., 33 Fed. Rep. 615, Mr. Justice Brewer, in deciding the case, uses the following language with reference to the case of Dixon Co. v. Field: "I suppose the universal voice of the bar would affirm that the supreme court had settled beyond any question that recitals as full and complete as these estopped a county from denying the validity of the bonds in the hands of a bona fide purchaser. It has been supposed by some that this case of Dixon Co. v. Field has reversed prior decisions, and established a new rule. I am frank to say that I think it is quite difficult to appreciate the distinction which Mr. Justice Matthews draws between that case and the case of Marcy v. Township of Oswego, 92 U. S. 637, but, even with the rule as laid down in Dixon Co. v. Field, it will not

avail the defendant in this case." The court does not overrule the case of Marcy v. Township of Osweg o, 92 U. S., and numerous other cases of a similar import, but distinctly says that the decision is in harmony with the decision in the case of Marcy v. Township of Oswego. In giving the opinion of the court in the case of Dallas Co. v. McKenzie, 110 U. S. (the case being decided at the same term as that of Dixon Co. v. Field), Mr. Chief Justice WAITE says: "In Marcy v. Township of Oswego, 92 U. S. 637, and Humboldt v. Long, Id. 642, and also in Wilson v. Salamanca, 99 U. S. 504, it was expressly decided that municipal bonds were not invalid in the hands of a bona fide holder by reason of their having been voted and issued in excess of the statutory limit, if the recitals imported a valid issue.

It is an admitted fact in this case that McKenzie, the defendant in error, is a bona fide holder for value of the coupons sued on; and the recitals, which are almost in the exact language of Wilson v. Salamanca, supra, imply authority for the issue of the bonds from which they were cut. Consequently in this case the excessive issue is no defense." This matter of an excessive issue is the real defense in this case here. It is urged by the appellant that, by reason of an excessive issue, there was a want of power in the county of Santa Fe to issue the bonds and coupons in question in this case. It seems to us that these cases are decisive of this one. The recitals in the present case certainly imported a valid issue, and we hold the bonds to be valid on the same grounds upon which similar bonds were held valid in the cases cited. They were floated on the faith of the law, as expounded by the supreme court at the time they were issued, and that law protects them. The bonds not having been affected by any constitutional or other jurisdictional invalidity, the appellee is protected, not only by the recitals, but by the recogni-

tion of the bonds by the county as valid and subsisting securities for a long series of years. The failure to take any steps in equity or otherwise to redress any wrong done the county by their issue, or to avoid their negotiation, and the actual levy and collection of taxes for the payment of the interest from year to year, and the payment of $36,000 of the interest upon these very securities, furnish additional grounds of estoppel, according to numerous authorities. Anderson County Commissioners v. Beal, 113 U. S. 227; Supervisors v. Schenck, 5 Wall. 772. When the bonds were issued and delivered, in pursuance of the vote of the people of Santa Fe county, a contract was entered into to which the county was a party. The object sought was obtained when the railroad to which the aid was granted was constructed and the bonds were delivered. The acquiescence shown by the appellant by its failure to take any steps to avoid the contract or the securities, or prevent their negotiation, and its recognition of the validity of the contract entered into by the issuance of bonds and the coupons attached to them, as shown by the levy and collection of the taxes for the specific purpose of paying the interest thereon, removes from this court any desire which it might, under other circumstances, have to relieve the county from its legal obligation, and upon the facts presented in this record we decline to do so. The judgment, it is true, provides for the issue of execution, but that is a mere irregularity which will not work a reversal of this case. The judgment is enforcible by tax levy as a part of the general levy, or by special levy, as already decided by this court in Laughlin v. County of Santa Fe, 3 N. M. (Gil.) 420, the provision for the payment of the principal and interest of the bonds as contained in the railroad act entering into the contract, and not having been repealed when the bonds were issued. Roll County Court v. U. S., 105 U. S. 733. Holding that

the defense set up in this case was unavailing, and the evidence rejected in the court below was inadmissible, and therefore properly excluded, we agree with the trial judge in his ruling that the case below presented a state of facts upon which the appellee was entitled to the verdict rendered under the instructions of the court. Armijo v. New Mexico Town Co., 3 N. M. 244; Delaware & Lackawana Railroad Co. v. Converse, 139 U. S. 469, 11 Sup. Ct. Rep. 569. The judgment appealed from is therefore affirmed, with costs against the appellant.

O'BRIEN, C. J., and SEEDS and LEE, JJ., concur.

FREEMAN, J. (dissenting).—I regret that I am not able to agree with the majority of the court in the conclusions reached in this important case. Failing in this, however, I do not feel at liberty to content myself with a mere dissent, without assigning any reasons therefor. I shall not attempt, however, to enter into any elaborate discussion of the questions involved. Waiving all questions growing out of the pleadings, I shall confine myself to a mere statement of my views as to the principal questions involved and decided. While this case was argued and submitted at the last term of the court, a conclusion was not reached by the majority until the meeting of the present term. In the preparation of the following dissenting opinion, therefore, I have been able to avail myself of a few hours only which could be spared from the current work of the term. I offer this as an apology for the somewhat desultory form in which my views are presented.

As I understand it, the doctrine held by a majority of the court may be stated substantially as follows: (1) Where it appears that the legislature of the territory has authorized the municipal authorities of a town or county to issue evidences of indebtedness on condi-

tions prescribed in the act, there being no constitutional limitation, and the authorities have issued such evidences of debt, reciting on the face of such instruments all the facts constituting a compliance with the terms of the enabling act, then an innocent purchaser for value of such obligations is entitled to recover the full amount, without regard to the question as to whether any or all of the conditions imposed by the legislature have been complied with. (2) That the purchaser of such bonds has only to take them in the one hand, and the enabling act in the other, and, reading them side by side, if the former on their face appear to have been issued in conformity with the latter, he need go no further in his investigations. (3) That if the legislature should authorize the officers composing the municipal authorities of the county to issue evidences of debt on certain conditions prescribed, as, for example, in pursuance of an election held for that purpose, wherein it should appear that three fourths of the qualified voters had voted in favor of such issue, and such officers should afterward issue bonds purporting on their face that they were issued in pursuance of the act of the legislature, and in pursuance of an election held under and by virtue of said act wherein three fourths of the qualified voters had voted in favor of such issue, that such pretended bonds would be valid against the county in the hands of an innocent purchaser without notice, although, as a matter of fact, no such election had ever been held, and the said board of officers had never been authorized to issue such pretended bonds, and although the bonds had been issued without either the consent or knowledge of a single qualified voter or taxpayer of the county. (4) That, to constitute a dealer in municipal bonds an innocent purchaser without notice, he has nothing to do but to see that the recitals on the bond agree with the recitals in the enabling act; that he is not affected with any infirmity, no mat-

ter what the character or extent of the infirmity may be; that, if he finds that the officers of the municipality were authorized to act under any circumstances, he has a right to assume that they acted within the scope of their authority; and that no amount or extent of abuse of that authority will affect the validity of the securities in his hands. (5) That, while absolute want of authority may be pleaded as a defense in such cases, abuse of authority can not be relied upon, unless such abuse appears on the face of the pretended bond itself. (6) That a municipal bond issued in direct violation of the law is just as valid in the hands of an innocent holder for value as a bond issued in pursuance of law, provided, always, that the fraudulent bond appears on its face to have been issued in pursuance of lawful authority. (7) That the purchaser of a municipal bond is not bound to take notice of the existence or non-existence of any fact affecting the validity of the bond, unless such fact appears on the face of the bond or in the body of the enabling act, although such fact may exist in the form of a public record, accessible to the general public. (8) That an act of the legislature authorizing the issuance of bonds in the aggregate amount of five per cent of the taxable property of the county, provided three fourths of the qualified voters at an election held for that purpose vote in favor thereof will validate the issue of bonds aggregating in amount ten, fifty, or one hundred per cent of the taxable property, the only requirement being that the bond recite on its face that it is issued in pursuance of the act of the legislature. (9) That in such cases the purchaser is not bound to take notice of the fact that the bond belongs to a series, the aggregate of which implies a confiscation of every dollar of property belonging to the people of the county, although such fact might have been ascertained by an examination of the public records of the county. (10) That such a bond

would be good in the hands of an innocent purchaser without notice of the "infirmity," although as a matter of fact no such election had in fact been held, and although as a matter of fact it had been issued without the knowledge of a single taxpayer of the county. (11) In a suit on such fraudulent bond it is no defense to show that the purchaser thereof by proper diligence might have advised himself of its fraudulent character; . that nothing short of actual notice can be shown.

I do not believe that these propositions are sound, although there are many decisions of the courts which seem to give color to them. These decisions have been collated in the able opinion concurred in by a majority of the court. Some of them, I admit, go to the full extent of supporting this doctrine; but those have been, in effect, overruled by the later and better considered cases. I shall not attempt an elaborate discussion of these questions, or to review all of the authorities cited by the majority of the court in support of them. The leading case relied on to sustain this view is that of Knox Co. v. Aspinwall, 21 How. 544. This decision was rested upon two propositions, substantially as follows: (1) That if proper public officers, acting within the scope of their official power, issue evidences of debt, such securities are entitled to the weight of a conclusive presumption that the officers issuing them have acted in the discharge of their duty; and in the hands of an innocent purchaser for value such securities are good against the county, although they may not have been issued with authority of law. (2) That if the legislature authorizes the board of the county or other municipal officers to issue evidences of debt on the occurring of a contingency, such as the casting of a popular vote therefor, and empowers such officers, or creates a board of officers, to determine the happening of such contingency or the result of such election, then the decision of such board, unless at-

tacked in a direct proceeding, is final and binding
upon the public. "The purchaser of bonds," say the
court, "had a right to assume that the vote of the
county which was made a precedent condition to the·
grant of the power had been obtained from the fact of
subscription. * * * The bonds on their face im-
port a compliance with the law. * * * The pur-
chaser was not required to look further," etc. This
decision has never in terms been overruled, but until a
comparatively recent period was followed as a prece-
dent. I say that it has never in terms been overruled,
but it has been worn away by the attrition of popular
judicial discontent, until there remains now not a ves-
tige of the first proposition. Let us see if this latter
statement is not only substantially, but literally, cor-
rect. Suppose a board of rascally county commission-
ers should get together, and without any authority
whatever issue county bonds, reciting merely on such
bonds that they were issued by virtue of lawful author-
ity, etc., there is not a respectable court anywhere
that would hold that the county might not defend in a
suit brought to collect such bonds, by showing that
the commissioners were not authorized by law to issue
such bonds; and yet that is precisely what the supreme
court in the Aspinwall case said could not be done. I
speak reverently, and with great respect, when I say
that this case is an illustration of the rule that no man
can rise above error, and of the danger of accepting
any proposition literally as a precedent. A long line
of decisions follow this as a precedent. It was long
the custom to refer to the Aspinwall as a well consid-
ered case, and yet it was left for Justice MILLER, in his
masterly dissenting opinion in the case of Humboldt
Tp. v. Long et al., 92 U. S. 646, to bring prominently
into notice for the first time the fact that Justice NEL-
SON in the Aspinwall case supported his opinion by an
erroneous conception of the doctrine laid down in the·

case of Royal British Bank v. Turquand, 6 El. & Bl. 327.

Speaking on this point, Justice MILLER said: "The original case on which this ruling [that county bonds, though issued without authority of law, may still be collected] is based is Knox Co. v. Aspinwall, 21 How. 539. It has, I admit, been frequently cited and followed in this court since then, but the reasoning on which it was founded has never been examined or defended until now (1875); it has simply been followed. The case of Town of Coloma v. Eaves, super, 484, decided a few days ago, is the first attempt to defend it on principle that has been made. How far that has been successful I will not undertake to say. Of one thing I feel very sure, that if the English judges who decided the case of Royal British Bank v. Turquand, on the authority of which Knox Co. v. Aspinwall was based, were here to-day, they would be filled with astonishment at this result of their decision. The bank in that case was not a corporation. It was a joint stock company in the nature of a partnership. The action was against the manager as such, and the question concerned his power to borrow money. This power depended, in this particular case, on a resolution of the company. The charter or deed of settlement gave the power, and when it was exercised the court held that the lender was not bound to examine the records of the company to see if the resolution had been legally sufficient. That was a private partnership. Its papers and records were not open to public inspection. The manager and directors were not officers of the law, whose powers were defined by statute, nor was the existence of the condition on which the power depended to be ascertained by the inspection of public and official records, made and kept by officers of the law for that very purpose. In all these material circumstances, that case differed widely from those now before us."

It occurs to me that much of the confusion and many of the contradictions that have grown out of the construction given to the power of municipal officers to bind the people by recitals on bonds issued by such officers have grown out of a failure to discriminate between those facts the existence of which must be ascertained by such officers and those facts the existence of which is, or may be, known to all men. When such officers are authorized to issue bonds on certain conditions, as, for example, on the application of a given number of taxpayers, or on a certain result of an election, the power to determine when the condition exists, or the event has occurred, or the contingency has "happened," must be lodged in some officer or board of officers; and the determination of such officers or board, unless attacked by a proper proceeding, must be accepted as conclusive evidence of such fact; it is a final determination of the matter properly submitted, and can not be questioned collaterally. A different rule controls, however, in the ascertainment of a pre-existent or coexistent fact; a fact that exists independently of any action; a fact that does not depend upon a contingency; one that does not depend upon the "happening" of an event such as the result of an election. When, therefore, the act authorizing the issuance of bonds limits the amount issued to a certain per cent of the taxable property, it seems to me that the limitation is an element of the authority to act, and that a disregard of this limitation vitiates the action of the board. The reason given, why the recitals on the bond that the conditions necessary to its validity have been kept is conclusive of that fact, is that these conditions, or the result of these contingencies, or the happening of these events, are peculiarly within the knowledge of the party or parties authorized to make the recital. "The persons appointed to decide whether the necessary prerequisites to their issue had been com-

pleted have decided, and certified their decision. They have declared the contingency to have happened, on the occurrence of which the authority to issue the bonds was complete. Their recitals are such a decision, and beyond those a bona fide purchaser is not required to look for evidence of the existence of things in pais. He is bound to know the law conferring upon the municipality power to give the bonds on the happening of a contingency; but whether that has happened or not is a question of fact, the decision of which is by law confided to others,—to those most competent to decide it,—and which the purchaser is, in general, in no condition to decide for himself." Town of Coloma v. Eaves, 92 U. S. 490.

But the amount of taxable property within a county is not "an event" or a "contingency." It is an independent fact, the ascertainment of which is within the reach of every one. It is a fact disclosed by record, open to the inspection of all. In the case under consideration, the appellant offered to show that the issue of bonds in controversy was in excess of the amount authorized by the act of the legislature, but he was not allowed to make that proof. Under the well recognized rule of pleading, this is an admission of the fact that the issue of the bonds was excessive. Various objections were made at the trial to the introduction of evidence to show that the issue of bonds was excessive. Everything in the shape of record was offered and rejected. The appellant then proposed to show by taxpayers themselves that the issue was excessive; so that it was not the character of the proof offered, but the character of the thing to be proven, that was objected to. The ruling of the court below, as appears by the record, was to the effect that the amount of taxable property in the county was an immaterial matter, and could not, therefore, be shown by any character of proof. It is said, however, that this is no longer an

open question; that the supreme court of the United States has held that an overissue of bonds can not be shown by the county as a defense against recovery, unless such overissue is in violation of a constitutional limitation; and, as there is no such authority in this territory as a constitution (unless the enabling act may be termed a constitution), that, therefore, county and municipal corporations are not subject to the control of any higher power in this regard.   I admit the force of this contention.   It is something more than ingenious; it is plausible; but to my mind it is unsatisfactory.   It is unsatisfactory, because it involves the corollary that a municipal corporation created by the legislature, drawing all its powers from that body, may do, not only what it is not authorized to do, but that which it was absolutely forbidden to do.

In view of the great reliance placed upon the doctrine that the county is, by the action of the board of commissioners and the recital on its bonds, estopped from setting up the defense of overissue, it is interesting, if not instructive, to inquire how this doctrine found its way into our decisions.   The first decision of the supreme court, so far as I can ascertain, which undertakes to give a reason why an overissue does not invalidate the bonds, is that of Humboldt Township v. Long et al., 92 U. S., and the reasoning is found at the bottom of page 645.   Omitting the reasons given, the court cites Marcy v. Township Oswego, 637, of the same book, as authority for the rule.   Now, if we turn to the case last cited, we shall find that the question of overissue was the only matter before the court. It was admitted that the bonds were issued in strict compliance with the act of the legislature, unless they were voted and issued in excess of the amount authorized by the act.   It was shown that the recitals on the bonds were to the effect that they were issued in accordance with the act; that the bonds were regis-

tered, etc. Justice STRONG, after reciting the facts in the case, said: "In view of these facts, and of the decisions heretofore made by this court, the first question certified to us can not be considered an open one. We have recently reviewed the subject in Town of Coloma v. Eaves, supra, page 484, and reassert what had been decided before," etc. Here it will be observed that the court refers to decisions "heretofore made by this court," and particularly to the case of Town of Coloma v. Eaves, supra, 484. Turning, now, to the case last cited, as authority for this proposition, we find that the question of overissue was not even remotely involved. The only question involved was as to the validity of the election, which was attacked on the ground of a want of legal and proper notice. The syllabus in that case is taken from the body of the opinion, and is in the exact words of Justice STRONG, who delivered the opinion of the court. I shall presently give this syllabus in full, and that for the important consideration that it is a very carefully prepared statement of the rule as laid down by Justice STRONG himself. On page 491 of the book, after reciting the rule laid down by Judge DILLON, and criticising it as a "very cautious statement of the doctrine," he states the rule as follows: "Where the legislative authority has been given to a municipality or to its officers to subscribe for the stock of a railroad company, and to issue municipal bonds in payment, but only on some precedent condition, such as a popular vote favoring the subscription, and where it may be gathered from the legislative enactment that the officers of the municipality were invested with power to decide whether the condition precedent had been complied with, their recital that it has been made in the bonds issued by them, and held by a bona fide purchaser, is conclusive of the fact, and binding upon the municipality, for the recital is itself a decision of the fact by the appointed tribunal."

Now, with great respect, I submit that this rule fails to sustain the doctrine that an overissue can not be shown as a defense. In the case under consideration the amount authorized to be issued was limited to five per cent of the taxable property. In what sense, "may it be gathered from the legislative enactment that the officers of the municipality were invested with the power to decide" as to the amount of taxable property in the county, so that their decision should become "conclusive of the fact, and binding upon the municipality?" In what possible sense is the amount of taxable property a "contingency" or an "event," the "happening" of which is to be certified to, or a condition precedent "that has been complied with?" I submit, therefore, that this pernicious doctrine that, under authority of an act of the legislature authorizing them to issue bonds to the extent of five per cent of the taxable property of the county, the board of county commissioners may bind the county in an unlimited issue,—may bankrupt and ruin the county by an overissue,—is, like the kindred doctrine laid down in the Aspinwall case, that the recital of the officers themselves that the bonds were issued in accordance with the law was binding upon the county in the absence of lawful authority, a parasite that has grown out of the misconstruction of the rule laid down in Town of Coloma v. Eaves, 92 U. S. 492, just as the Aspinwall case was the result of the misconstruction of the English case of Royal British Bank v. Turquand, 6 El. & Bl. 327.

The doctrine of estoppel by recitals had its origin and owes its existence to the consideration that the recitals are made by the parties who are by law vested with the means to determine, and the authority to announce, the performance of the condition or the happening of the contingency upon which the authority for the issuance of the bonds is made to depend, "and

this is more emphatically true when the fact is peculiarly within the knowledge of the persons to whom the power to issue the bonds has been conditionally granted." Marcy v. Township Oswego, 92 U. S. 639. If an unlimited overissue will not in any event, except in the case of constitutional limitations, affect the validity of the transaction, then these county officers are invested with the power of confiscation, and this power is given by construction merely,—a construction drawn from the case of Marcy v. Oswego Township, which was itself a construction of a former decision, which rested the doctrine on a still earlier case, wherein the question did not arise.

I assert with great respect that this extraordinary doctrine that a board of county commissioners supposed to be the creatures of the law and servants of the people may, under authority of a law authorizing them to issue bonds to the amount of five per cent, bind the people to the payment of fifty per cent, has never been upheld by the supreme court, as a matter of first impression. I have already adverted to the doctrine that recitals, to be regarded as estoppels, should be confined strictly to the matters intrusted solely to the officers whose recitals are relied upon. In view of the extraordinary results reached by the attempted application of the doctrine of estoppel by recitals, the views of the supreme court as laid down in Northern Bank v. Porter Tp., 110 U. S. 614, et seq., are instructive. I quote: "It is, however, contended that by the settled doctrines of this court the township is estopped, by the recitals of the bonds in suit, to make its present defense. The bonds, upon their face, purport to have been issued 'in pursuance of the provisions of the several acts of the general assembly of the state of Ohio, and of a vote of the qualified electors in said township of Porter, taken in pursuance thereof.' These recitals, counsel argue, import a compliance, in all respects, with the law; and

therefore the township will not be allowed, against a
bona fide holder for value, to say that the circumstan-
ces did not exist which authorized it to issue the bonds.
It is not to be denied that there are general expressions
in some former opinions which, apart from their spe-
cial facts, would seem to afford support to this propo-
sition in the general terms in which it is presented.
But this court said in Cohens v. Virginia, 6 Wheat.
399, and again in Carroll v. Lessee, 16 How. 287, that
it was 'a maxim not to be disregarded that general ex-
pressions in every opinion are to be taken in connec-
tion with the case in which those expressions are used.
If they go beyond the case, they may be respected, but
ought not to control the judgment in a subsequent
suit, when the very point is presented for decision.'
'An examination of the cases in which those general
expressions are found will show that the court has
never intended to adjudge that mere recitals by the
officers of a municipal corporation in bonds issued in
aid of a railroad corporation preclude an inquiry, even
where the rights of a bona fide holder were involved,
as to the existence of legislative authority to issue
them.' A reference to a few of the adjudged cases will
serve to illustrate the rule which has controlled the
cases involving the validity of municipal bonds. In
Knox Co. v. Aspinwall, 21 How. 542, 62 U. S. XVI.
209, power was given to county commissioners to sub-
scribe stock to be paid for by county bonds, in aid of
a railroad corporation, the power to be exercised if the
electors, at an election duly called, should approve the
subscription. It was adjudged that, as the power ex-
isted, and since the statute committed to the board of
commissioners authority to decide whether the election
was properly held, and whether the subscription was
approved by a majority of the electors, the recital in
bonds executed by those commissioners, that they were
issued in pursuance of the statute giving the power,

estopped the county from alleging or proving, to the
prejudice of a bona fide holder, that requisite notices of
the election had not been given. In Bissell v. Jefferson-
ville, 24 How. 299, the court found that there was
power to issue the bonds, and that after they were
issued and delivered to the railroad company it was too
late, as against a bona fide holder, to call in question
the determination of the facts which the law prescribed
as the basis of the exercise of the power granted, and
which the city authorities were authorized and required
to determine before bonds were issued. Probably the
fullest statement of the settled doctrine of this court is
found in Coloma v. Eaves, 92 U. S. 491. In that case
the authority to make the subscription was made by
the statute to depend upon the result of the submission
of the question to a popular vote, and its approval by
a majority of the legal votes cast. But whether the
statute in these particulars was complied with was left
to the decision of certain persons who held official rela-
tions with the municipality in whose behalf the pro-
posed subscription was to be made. It was in refer-
ence to such a case that the court said: 'When legisla-
tive authority has been given to a municipality or to
its officers to subscribe to the stock of a railroad com-
pany, and to issue municipal bonds in payment, but
only on some precedent condition, such as a popular
vote favoring the subscription, and where it may be
gathered from the legislative enactment that the offi-
cers of the municipality were invested with power to
decide whether the condition precedent has been com-
plied with, their recital that it has been made in the
bonds issued by them, and held by a bona fide pur-
chaser, is conclusive of the fact, and binding upon the
municipality; for the recital is itself a decision of the
fact by the appointed tribunal.' This doctrine was
reaffirmed in Buchanan v. Litchfield, 102 U. S. 290,
and in other cases, and we perceive no just ground to

doubt its correctness, or to regard it as now open to question in this court.   But we are of opinion that the rule as thus stated does not support the position which counsel for plaintiff in error take in the present case. The adjudged cases, examined in the light of their special circumstances, show that the facts which a municipal corporation, issuing bonds in aid of the construction of a railroad, was not permitted, against a bona fide holder, to question, in face of a recital in the bonds of their existence, were those connected with or growing out of the discharge of the ordinary duties of such of its officers as were invested with authority to execute them, and which the statute conferring the power made it their duty to ascertain and determine before the bonds were issued; not merely for themselves, as the ground of their own action in issuing the bonds, but equally, as authentic and final evidence of their existence, for the information and action of all others dealing with them in reference to it.''

The majority of the court give great weight to what appears to be the bona fides of the several transactions out of which this litigation has arisen.   The appellee is represented as a bona fide purchaser without notice, etc., and the contention is that the bonds were issued in different series, so that it would be impossible for the purchaser to ascertain from the recital the amount issued, or the amount of taxable property of the county.   And the further fact that these bonds were made payable to bearer is relied on to bring them within the rule applicable to ordinary commercial paper, to the extent that their possession implies the presence of all the conditions necessary to a recovery. This seemingly equitable view of the question is discussed in the case of Marsh v. Fulton Co., 10 Wall. 676.   The facts in that case were substantially these: Under authority of the act of the legislature, the county had voted aid to the Mississippi & Wabash Railroad

Company.    The legislature afterward changed the
charter of the company by dividing the road into three
sections.    Thereafter the board of supervisors, in pur-
suance of the power conferred upon the board by an
election, proceeded to enter the subscription of stock
on the books of the "Central Division of the Mississippi
& Wabash Railroad Company," and issued bonds pay-
able to that company or bearer.    Afterward, interest
was paid on these bonds.    County agents were ap-
pointed to attend at the meeting of stockholders, which
agents voted for the officers of the company, and in
various ways the county recognized the validity of the
bonds.    It would appear that if by any possibility the
holder of a bond could acquire, by mere force of
equity, a right to insist upon the payment of his bond,
this case would afford an illustration of the rule.    The
legislature had authorized the county to issue the
bonds; the line of road sought to be aided had been
laid out; the road had been built; the bonds had been
issued; the interest had been paid; county officers had
been allowed to control in part the operations of the
road.    No other irregularity intervened, except that
the road was divided into three divisions.    In the case
at bar the legislature had authorized the county to vote
aid to any railroad, limiting the amount of aid to five
per cent of the amount of taxable property.    The bonds
under consideration had been issued as the result of
two elections held on the same day, or what was in
reality one election, at which a proposition was agreed
to extending county aid to a single railroad company.
The manner of calling and holding this election, the
division of the propositions so as to appear to keep
within the limitations of the act, was a palpable eva-
sion of the well known limitations imposed by the act,
under which the county proposed to act, and the pur-
chaser of the bonds in question must have obtained
them with a knowledge of this evasion.    In the case,

however, to which I have just referred, no such effort at evasion appears to have occurred, and yet the supreme court in the suit brought against the county on one of these bonds held that the plaintiff could not recover. The following is taken from the opinion of the court: "But it is earnestly contended that the plaintiff was an innocent purchaser of the bonds without notice of their invalidity. If such were the fact, we do not perceive how it could affect the liability of the county of Fulton. This is not a case where the party executing the instruments possessed a general capacity to contract, and where the instruments might not for such reason be taken without special inquiry into their validity. It is a case where the power to contract never existed,—where the instruments might, with equal authority, have been issued by any other citizen of the county. It is a case, too, where the holder was bound to look to the action of the officers of the county, and ascertain whether the law had been so far followed by them as to justify the issue of the bonds. The authority to contract must exist before any protection as an innocent purchaser can be claimed by the holder. This is the law, even as respects commercial paper, alleged to have been issued under a delegated authority, and is stated in the case of Floyd's Acceptances, ante. In speaking of notes and bills issued or accepted by an agent, acting under a general or special power, the court says: 'In each case the person dealing with the agent, knowing that he acts only by virtue of a delegated power, must, at his peril, see that the paper on which he relies comes within the power under which the agent acts. And this applies to every person who takes the paper afterward; for it is to be kept in mind that the protection which commercial usage throws around negotiable paper can not be used to establish the authority by which it was originally issued.' "

It is insisted by the majority that great weight ought to be given to the presumption that the appellee was an innocent purchaser for value, without notice of any infirmity attending the issue of these bonds, and attention is directed to the fact that the bonds were issued in such series, and were so indefinite in their recitals, as to render it impossible for the purchaser upon inspection, to determine by such inspection that they were issued in violation of law. I am not able to agree with this conclusion. On the contrary, it appears to me that these very facts were suspicious circumstances that ought to have put the purchaser upon inquiry. The fact that two elections were held on the same day, at the same hour and the same place; that at these two elections were submitted two propositions, authorizing the issuance of two amounts of bonds to the same corporation,—is of itself a circumstance that ought to have put the purchaser upon inquiry. It has been repeatedly held that when an intended purchaser is put upon inquiry he must follow out that inquiry by all the means reasonably within his reach. He knew that these bonds were issued by public officers; that these officers were acting under a limited authority; he knew that they had no authority to bond the county beyond the sum of five per cent of the taxable property. He had access to the assessment rolls. He could have ascertained that the sum of the bonds proposed to be issued was largely in excess of the amount authorized; and this fact would have advised him of the fraudulent process by which the officers of the county sought to avoid the limitations imposed upon them by the legislature. In a long line of decisions sustaining the validity of illegally issued bonds, it was the avowed purpose of the court to maintain the public credit of municipalities, but, behind this bulwark erected by the supreme court for a purpose so admirable, the most flagrant schemes of public plunder sought shelter. The

dishonest speculator in public securities had but to conspire with dishonest county officers to procure the issue of fraudulent county bonds, which should contain on their face the fatal "recital" that they were issued in pursuance of a certain statute, and the work of plunder, the graceless theft, was accomplished.

That it may appear that this statement is correct, let the record speak. In the case of Comanche Co. v. Lewis, 133 U. S. 201, 10 Sup. Ct. Rep. 286, the county which it was sought to plunder was organized, as it was admitted of record, "solely for purposes of plunder, by a set of men intending to secure a de facto organization, and issue the bonds of said county, register and sell them to distant purchasers ignorant of the facts, and enrich the schemers, while plundering the future inhabitants and taxpayers of the counties; and upon the consummation of said scheme, in the spring or early summer of 1874, all of said schemers, together with those who were the said de facto officers of the said county, left said county, and never returned, and said county remained with said organization, totally abandoned, until in February, 1885, when said county was, upon memorial presented and census taken, organized as in cases of unorganized counties." Here a large and uninhabited section of the state was, twelve years prior to its legal organization as a county, incumbered with a debt that its future inhabitants must pay, for the bonds were held to be valid. I can not but regard this decision as the greatest possible tribute paid by a great tribunal to the doctrine of stare decisis. The reasons and arguments adduced in support of the decision demand and receive our highest respect, because they emanate from that great tribunal, our supreme court, but I seriously doubt if any fairminded lawyer ever contemplated the result with entire satisfaction.

I shall conclude what I have to say on this branch of the case by quotation from the dissenting opinion of

Justice MILLER in the case of Humboldt Tp. v. Long et al., already referred to: "The simplicity of the device by which this doctrine is upheld as to municipal bonds is worthy the admiration of all who wish to profit by the frauds of municipal officers. It is that, wherever a condition or limitation is imposed upon the power of those officers in issuing bonds, they are the sole and final judges of the extent of those powers. If they decide to issue them, the law presumes that the conditions on which their powers depended existed, or that the limitation upon the exercise of the power has been complied with; and especially and particularly if they make a false recital of the fact on which the power depends in the paper they issue, this false recital has the effect of creating a power which had no existence without it." With great deference, and with some hesitation, I have ventured the foregoing discussion of this question, and have indulged in comment upon the decisions of the supreme court of the United States. I am not to be reminded that the decisions of that court are binding upon this, nor that it would be a palpable violation of every element of good taste and proper decorum for a member of this court, or for the court itself, to question the authority of these decisions. Such is not my purpose. I propose to demonstrate, if I can, the proposition that the conclusion I have reached in the case under consideration is in harmony with the later decisions of the supreme court.

Before proceeding, however, I desire to advert briefly to another feature of this case. It has been sought to bind the county, not only by the recitals on the bond, but by an agreement entered into between the attorneys for the appellant and those of the appellee, and offered and received in evidence in the court below. Much importance has been attached to this agreement, which may be found on page 76 of the record. I can not accept the construction given to it by the majority

of the court.  It is an admission as to matters of fact
made by the attorneys for the appellant.  If at the
time this admission was made it was intended to have
the effect contended for by the appellee, and agreed to
by a majority of the court, then it was a fraud practiced
upon the people of this county by the attorneys for the
appellant, and ought not to be allowed to stand.  Under
this pretended agreement, the appellee was allowed to
take a judgment for a large amount, confessedly not
due at the date of the institution of the suit.  I shall
not enter into a discussion of the question as to how
far a client is bound by the admissions of his attorney.
It seems to me that in this case a proper distinction has
not been observed between the authority of an attorney
representing a municipal corporation and one repre-
senting a private corporation or individual.  In this as
in other branches of this case the majority have not
given due consideration to the fact that the only real
parties interested are the complainant on the one side
and the taxpayers on the other.  The men who
employed these attorneys who made these admissions
of record were themselves but the agents of the real
parties in interest.  It is too clear for argument that an
attorney employed by the officers of a municipal cor-
poration to protect the rights of the taxpayers of such
municipality has no authority to go into court, and
confess judgment against his clients.  The county com-
missioners themselves had no authority to do anything
or to take any steps that would validate these bonds.
Ordinarily the principal is bound by the acts of his
agent, if such agent act within the scope of his authority;
but it must be borne in mind that these attorneys were
themselves but the agents of agents.  They were the
servants of the commissioners, who were in turn the
servants of the public.  "It is not, in our opinion,
competent for the authorities of a town to agree that
its void bonds shall be made valid by putting that

agreement in the form of a judicial decree." Kelly v. Town of Milan, 21 Fed. Rep. 869. In the same case it is further said: "In a case like that we are now considering, an agreement that would impose, without legislative authority, a tax upon the citizens of the municipality to pay bonds that were void, is itself a fraud, no matter how well intentioned, or how much the parties believed in their power to make it." The opinion in this case was rendered by Judge HAMMOND, and concurred in fully by Associate Justice MATTHEWS of the supreme court. I do not mean to impute to the attorneys in this case any fraudulent purpose. On the contrary, it was insisted by them in the court below that such was not a proper construction of the stipulation, and they earnestly protested against allowing the stipulation, with this construction, to go to the jury. Record, p. 59.

I have endeavored to give respectful consideration to the numerous decisions of the supreme court cited by the majority of the court in support of the propositions sought to be maintained. I have endeavored to show that one of the most dangerous features of this doctrine of "estoppel by recitals" found its way into an early decision of the court by inadvertence. The doctrine that a county officer can bind the people of the county by a mere recital, while it has never been overruled, is not now regarded as the law. I am now about to show that not only has this feature of the Aspinwall case been allowed to fall into disuse, but that other propositions contained in that decision, and supported by such an array of authorities as has been presented by the majority of the court in this case, have, in effect, been overruled by later decisions of the supreme court. I say, in effect, for they, I admit, have not been overruled in express terms; but the doctrine laid down by that court in the case of Dixon County v. Field, to which I shall presently advert, is so absolutely incon-

sistent with the doctrine of the case of Knox County v. Aspinwall, as to render it as thoroughly impossible that both should be the law as that daylight and darkness should exist at the same hour and the same place.

In the case of Dixon County v. Field, 111 U. S. 83, 4 Sup. Ct. Rep. 315, the question was again before the supreme court of the United States. I shall offer no apology for quoting somewhat in extenso from the opinion of the court in this case. The facts upon which the opinion was rendered were substantially as follows, as found by the court: The party bringing the suit against the county was an innocent holder for value of coupons sued on, and of the bonds to which they belonged. The bonds were executed in proper form, under the seal of the county, and were issued as a donation to a railroad company. Each bond contained the recital that it was issued under and in pursuance of the order of the county commissioners of the county of Dixon, state of Nebraska, and that the issue was authorized by an election held in said county under and by virtue of a general statute of the said state of Nebraska, which statute was referred to and set out. On the back of each bond was the certificate of the county clerk, reciting that this issue of bonds was the only one ever made by the county; that the question of issuing them was submitted to the county by resolution of the county commissioners, etc. There was also indorsed on each bond the certificate of the secretary and auditor of the state of Nebraska, reciting that it was issued in pursuance of law, etc. Justice MATTHEWS, in delivering the opinion of the court, wherein it was decided that the county was not chargeable, said: "Recurring, then, to a consideration of the recitals in the bonds, we assume, for the purpose of this argument, that they are, in legal effect, equivalent to a representation or warranty or certificate on the part of the county

officers that everything necessary by law to be done
has been done, and every fact necessary by law to have
existed did exist, to make the bonds lawful and binding.
Of course, this does not extend to or cover matters of
law.  All parties are equally bound to know the law;
and a certificate reciting the actual facts, and that
thereby the bonds were conformable to the law, when,
judicially speaking, they are not, will not make them
so, nor can it work an estoppel upon the county to
claim the protection of the law.  Otherwise, it would
always be within the power of a municipal body to
which power was denied to usurp the forbidden author-
ity by declaring that its assumption was within the law.
This would be the clear exercise of legislative power,
and would suppose such corporate bodies to be superior
to the law itself.  And the estoppel does not arise except
on matters of fact which the corporate officers had
authority by law to determine and to certify.  It is not
necessary, it is true, that the recitals should enumerate
each particular fact essential to the existence of the
obligation.  A general statement that the bonds had
been issued in conformity with the law will suffice, so
as to embrace every fact which the officers making the
statement are authorized to determine and certify.  A
determination and statement as to the whole series,
where more than one is involved, is a determination
and certificate as to each essential particular.  But it
still remains that there must be authority vested in the
officers by law as to each necessary fact, whether enu-
merated or nonenumerated, to ascertain and determine
its existence, and to guaranty to those dealing with them
the truth and conclusiveness of their admissions.  In
such a case, the meaning of the law granting power to
issue bonds is that they may be issued, not upon the
existence of certain facts, to be ascertained and deter-
mined whenever disputed, but upon the ascertainment

and determination of their existence by the officers or body designated by law to issue the bonds upon such a contingency.

This becomes very plain when we suppose the case on such a power granted to issue bonds, upon the existence of a state of facts to be ascertained and determined by some persons or tribunal other than those authorized to issue the bonds. In that case it would not be contended that a recital of the facts in the instrument itself, contrary to the finding of those charged by law with that duty, would have any legal effect. So, if a fact necessary to the existence of the authority was by law to be ascertained, not officially by the officers charged with the execution of the power, but by reference to some express and definite record of a public character, then the true meaning of the law would be that the authority to act at all depended upon the actual objective existence of the requisite fact as shown by the record, and not upon its ascertainment and determination by anyone; and the consequence would necessarily follow that all persons claiming under the exercise of such a power might be put to proof of the fact made a condition of its lawfulness, notwithstanding any recitals in the instrument. This principle is the essence of the rule declared upon this point by this court, in the well considered words of Mr. Justice STRONG in Town of Coloma v. Eaves, 92 U. S. 484, where he states (page 491) that it is 'where it may be gathered from the legislative enactment that the officers of the municipality were invested with the power to decide whether the condition precedent has been complied with' that 'their recital that it has been made in the bonds issued by them, and held by a bona fide purchaser, is conclusive of the fact, and binding upon the municipality; for the recital is itself a decision of the fact by the appointed tribunal.' The converse is embraced in the

proposition, and is equally true. If the officers authorized to issue bonds upon a condition are not the appointed tribunal to decide the fact which constitutes the condition, their recital will not be accepted as a substitute for proof. In other words, where the validity of the bonds depends upon an estoppel claimed to arise upon the recitals in the instrument, the question being as to the existence of power to issue them, it is necessary to establish that the officers executing the bonds had lawful authority to make the recitals and to make them conclusive. The very ground in the estoppel is that the recitals are the official statements of those to whom the law refers the public for authentic and final information on the subject. This is the rule which has been constantly applied by this court in the numerous cases in which it has been involved. The differences in the result of the judgments have depended upon the question whether in the particular case under consideration a fair construction of the law authorized the officers issuing the bonds to ascertain, determine, and certify the existence of the facts upon which the power, by the terms of the law, was made to depend; not including, of course, that class of cases in which the controversy is related, not to conditions precedent, on which the right to act at all depended, but upon conditions affecting only the mode of exercising a power admitted to have come into being. Marcy v. Oswego, 92 U. S. 637; Commissioners v. Bolles, 94 U. S. 104; Commissioners v. Clark, 94 U. S. 278; County of Warren v. Marcy, 97 U. S. 96; Pana v. Bowler, 107 U. S. 529, 2 Sup. Ct. Rep. 704. In the present case there was no power at all conferred to issue bonds in excess of an amount equal to ten per cent upon the assessed valuation of the taxable property in the county. In determining the limit of power, there were necessarily two factors—the amount of the whole bonds to be issued,

and the amount of the assessed value of the property for purposes of taxation. The amount of the bonds issued was known. It is stated in the recital itself. It was $87,000. The holder of each bond was apprised of that fact. The amount of the assessed value of the taxable property in the county is not stated; but ex vi termini it was ascertainable in one way only, and that was by reference to the assessment itself, a public record equally accessible to all intending purchasers of bonds, as well as to the county officers. This being known, the ratio between the two amounts was fixed by an arithmetical calculation. No recital involving the amount of the assessed taxable valuation of the property to be taxed for the payment of the bonds can take the place of the assessment itself, for it is the amount, as fixed by reference to that record, that is made by the constitution the standard for measuring the limit of the municipal power. Nothing in the way of inquiry, ascertainment, or determination as to that fact is submitted to the county officers. They are bound, it is true, to learn from the assessment what the limit upon their authority is, as a necessary preliminary in the exercise of their functions and the performance of their duties, but the information is for themselves alone. All the world besides must have it from the same source and for themselves. The fact, as it is recorded in the assessment itself, is extrinsic and proves itself by inspection, and concludes all determinations that contradict it."

The doctrine laid down in this case was afterward adopted and approved in the case of Lake Co. v. Rollins, 130 U. S. 662, 9 Sup. Ct. Rep. 651; also in the case of Lake Co. v. Graham, 130 U. S. 674, 9 Sup. Ct. Rep. 654. I am aware that the distinction drawn by the court between the three cases last cited and the cases cited by the majority of the court, wherein

the recitals have been held to operate as an estoppel
on the county, is that the doctrine in the latter was
applied to the cases of bonds issued in contravention
of statutory restrictions, whereas in the former the
restriction was constitutional. I admit that the dis-
tinction exists, but, whatever may be the force of its
application, it can not destroy or impair the truth of
the proposition settled in a long line of decisions
reaffirmed in the Dixon county case, that the recital
of the officer, in order to constitute it an estoppel,
must be confined to such matter as is committed alone
to his charge. It will be observed that the only. cases
in which the supreme court has determined that the
recitals contained in the bond are to be regarded as
estoppels are those in which the people of the particu-
lar state have chosen to commit the whole question to
the legislature, and have not undertaken to restrict the
legislature by any constitutional enactment. The
decisions proceeded upon the ground that, the legis-
lature being thus unrestricted by any constitutional
limitation, and having committed the authority to act
in this regard to the board of county officers, the
people are bound by such action. In the case at bar
there is a distinction which in my mind relieves the
court from the operation of this rule. In this case is
involved the right of a municipality created by the
territorial legislature to violate the terms imposed by
an act of the legislature. Here we have no constitu-
tion, the enabling act being sometimes called a consti-
tution. It serves many of the purposes of a constitu-
tion, but it is nevertheless not a constitution. A
constitution is the highest form of organic power
erected by the people, who are themselves the subjects
of that power. On the contrary, the people of the
territory had no voice or hand in the matter of creat-
ing the organic act. Whatever of sovereignty may
reside in the people of the territory is represented by

the legislature. It is the highest branch of organized local authority. If a corporation created by the legislature may violate the charter of its existence, there is no power on earth interested in its affairs which can control its operation. The people of this territory can not call a constitutional convention for the purpose of imposing limitations upon the power of the legislature, or the power of municipal corporations. It follows, therefore, that if the municipalities may openly violate acts of limitation passed by the legislature, there remains to the people but one escape from their absolute control, and that is by means of destroying them altogether. It is not my purpose to go into any elaborate discussion of the distinction between the powers of the territory and those of the state. "A territory, under the constitution and laws of the United States, is an inchoate state—a portion of the country not included within the limits of the United States; and not yet admitted as a state into the United States, but organized under the laws of congress, with a separate legislature, under a territorial governor and other officers, appointed by the president and senate of the United States." Ex parte Morgan, 20 Fed. Rep. 305. "The territorial status is one of pupilage, at best, and may include the mere child as well as the adolescent youth." Nelson v. U. S., 30 Fed. Rep. 115. In the case of Clinton v. Engelbrecht, 13 Wall. 443, it was said: "The theory upon which the various governments for portions of the territory of the United States have been organized has ever been that of leaving to the inhabitants all the powers of self-government consistent with the supremacy and supervision of the United States." So, also, in the case of Hornbuckle v. Toombs, 18 Wall. 655, it was said: "The powers thus exercised by the legislature are nearly as extensive as those exercised by state legislatures." Thus it will be seen that, wherever reference is made to terri-

torial governments by comparison they are represented as exercising prerogatives inferior to those conferred upon the state.

It may be said that the distinction drawn between the power of the territorial legislature and that of the state legislature is more technical than substantial; but I respectfully suggest that it is as substantial as that drawn by the supreme court of the United States in the case of municipalities acting under legislative enactments in the presence of constitutional provisions on the one hand, and on the other that of similar corporations acting under the provisions of legislative enactments, in the absence of such restrictions. With Justice BREWER, I am at loss to understand the real grounds for this distinction. It has been formally established, however, by the supreme court, and is a part of the law of the land, and I can see nothing in reason or authority which forbids the application of a similar doctrine to the cases of municipal corporations of a territory acting under and by virtue of the authority of the territorial legislature. In the case of the state, the highest local authority is the constitution; in the case of the territory, the highest organized local authority is that of the legislature. If a bond issued by the municipal authorities of a state, in violation of the highest organic law of the state, is void, I can not understand why it is that a bond issued by a municipal corporation of a territory, in violation of the highest expressed authority of the territory, is not also void.

But, in the view that I have taken of the law, we are not left to the somewhat uncertain rules of construction. The power of municipal corporations of a territory to issue bonds has been the subject of congressional legislation. By acts approved March 2, 1867, June 10, 1872 (Rev. Stat., sec. 1889), it was provided, "the legislative assemblies of the several terri-

tories shall not grant private charters or special privileges, but they may, by general incorporation act, permit persons to associate themselves together as bodies corporate for mining, manufacturing, and other industrial pursuits, or in the construction and operation of railroads," etc.    A question having arisen as to whether this act of congress did not take away entirely the power of the legislature to grant charters, congress passed an act, the substance of which, or so much thereof as is applicable to the matter under considera- tion, is as follows:    "That the words 'the legislative assemblies of the several territories shall not grant private charters or special privileges,' in section 1889, Rev. St., shall not be construed as prohibiting the leg- islative assemblies of the several territories of the United States from creating towns or other municipal corporations    *    *    *    and conferring on them * * * powers and privileges necessary to their local ad- ministration.    *    *    *    But nothing herein shall have the effect    *    *    *    to authorize any such cor- poration to incur hereafter any debt or obligation other than such as shall be necessary to the adminis- tration of its internal affairs."    Act June 8, 1878 (20 St. 101).

The only remaining question to be determined is whether a county is a municipal corporation, within the meaning of this act.    That a county is a corpora- tion will be admitted; that it is not, within the strict sense of that term, a municipal corporation, is con- ceded.    ·I think, however, that an examination of the authorities will lead us to the conclusion that within the scope of the inhibition contained in the act of con- gress just referred to, counties may be regarded as municipal corporations.    It is very true that Mr. Dillon, in his treatise of the Law of Municipal Corporations, has undertaken to distinguish between "political," "public," and "civil," "municipal," and quasi cor-

porations, wherein he holds that a "school district or county, properly speaking, is not, while the city is, a municipal corporation." Volume 1, p. 22. The references do not sustain the text, while the latter part of the section shows that the learned author was engaged in drawing a distinction in the nature of a preface to the following pages of his work; for he continues by saying: "The phrase 'municipal corporation,' in the contemplation of this treatise, has reference to incorporated villages, towns, and cities, with powers of local administration, as distinguished from other public corporations, such as counties and quasi corporations." If we examine the authorities, we shall find that the distinctions drawn as to different kinds of corporations have grown out of the particular function sought to be invoked, or the particular liability sought to be imposed; e. g., a county, unlike most of municipal corporations, is not responsible for the tort-feasance of its officers and agents, because such officers and agents are, in a large sense, the officers and agents of the state,—of the people, in their political capacity. Nevertheless a county is for many purposes a municipal corporation. The supreme court of Maryland, in the case of Talbot Co. Com'rs v. Commissioners of Queen Anne's Co., gave utterance to the following: "A county is one of the public territorial divisions of the state, erected and organized for public political purposes connected with the administration of the state government, and especially charged with the superintendence and administration of the local affairs of the community, and being in its nature and objects a municipal organization," etc. 50 Md. 246. The supreme court of Iowa treats the subject as follows: "The word 'municipal,' as originally used, in strictness applied to cities only. But the word has now a more extended meaning, and, when applied to corporations the words 'political,' 'municipal,' and 'public' are

used interchangeably. A municipal corporation is defined to be 'a public corporation,' created by government for particular purposes, and having subordinate and local powers of legislation, e. g., a county, city, etc." Curry v. District Tp. of Sioux City, 62 Iowa, 102; 17 N. W. Rep. 191, citing Bouv. Law Dict.; Winspear v. District Tp. of Holman, 37 Iowa, 542; Land Co. v. Carrol Co., 39 Iowa, 151. To show the diversity of understanding as to what constitutes a municipal corporation, I quote from a decision of the supreme court of Wisconsin to this effect: "Towns are often called, in common parlance, and sometimes unguardedly in statutes, 'municipal corporations,' in connection with counties, cities, and villages." Eaton v. Supervisors, 44 Wis. 493. The supreme court of Missouri, in defining a corporation for municipal purposes, says: "A corporation for municipal purposes is either a municipality such as a city or town, created especially for local self-government, with delegated legislative powers, or it may be a subdivision of the state for governmental purposes, such as a county, a school, or road districts," etc. State v. Leffingwell, 54 Mo. 458. Mr. Bouvier gives the following definition of a "municipal corporation:" "A municipal corporation is a public corporation, created by government for political purposes, and having subordinate and local powers of legislation, e. g., a county, town, city." Citing as authority for this definition 2 Kent, Comm. 275; Ang. & A. Corp. 929. There is another decision, however, that so far as the decision of a state court can be regarded as authority, settles this question beyond controversy. I refer to the case of Dowlan v. County of Sibley, decided by the supreme court of Minnesota, and reported at page 430, 36 Minn., and page 517, 31 N. W. Rep. This was an appeal to the district court from the determination of county commissioners in proceedings for the establishment of a

public ditch. From the judgment of the district court it was appealed to the supreme court of the state. DICKINSON, J., in rendering the opinion of the court, after quoting the provision of the state constitution as follows, "that the legislature may by general law or special act authorize municipal corporations to levy assessments for local improvements," etc., said: "The question now presented is whether the words 'municipal corporations,' as here employed, should be deemed to include counties. At the time of the adoption of this amendment, counties might, with propriety, be termed political corporations. The statute declared them to be such. Gen. St. 1866, chap. 8, sec. 75. They were not, however, in the proper and more general use of the term, municipal corporations; yet, for the purposes of general designation, it is not uncommon to use that term in a sense including such quasi corporations as counties and towns, and so sometimes to distinguish public or political corporations or functions from those which would be termed private. Thus, in our own decisions, may be found such language as this: 'A municipal corporation,—a city, county, or town' (Harrington v. Town of Plainview, 27 Minn. 224–229, 6 N. W. Rep. 777); 'a county or other municipal corporation' (County of Blue Earth v. Railroad Co., 28 Minn. 503–507, 11 N. W. Rep. 73). See, also, Winspear v. District Tp. of Holman, 37 Iowa, 542; Ex parte Selma & G. R. Co., 45 Ala. 696–732." After referring to the case of State v. Leffingwell, 54 Mo. 458, to which I have already referred, the learned judge continues: "A late amendment to our constitution prohibits the enactment of special or private laws 'granting to any individual, association, or corporation, except municipal, any special or exclusive privilege, immunity, or franchise whatever.' We feel no doubt that here the exception of 'municipal' corporations has a meaning broad enough to include counties and

towns," etc. "Nor, again, is it apparent why the power of the legislature in the particular here involved should be unrestricted as respects incorporated municipalities, and wholly denied as to counties and towns. Our consideration of this question has led us to the conclusion that the words 'municipal corporations' in the proviso under consideration may reasonably be construed as having the broad, rather than the restricted, sense, and as including such quasi corporations as counties and towns." In view of the foregoing, I think a proper definition of "counties" may be given as follows: A "county," when it represents a subdivision of the state in the exercise of those functions of government common to all the people of the state, e. g., in the organization of courts and the administration of the law, may be regarded as a public corporation of a quasi political character. But when it deals with matters which relate alone to the internal policy of the community of a strictly municipal character, such as the issuance of commercial obligations upon which it may be sued as if it were a private individual, it is a municipal corporation.

If my construction of the act of June 8, 1878, is correct, it is conclusive of this controversy. This act was passed just twenty months before a combination composed of the officers of the Southern Pacific Railroad Company and the county officials of Santa Fe county attempted to fasten a debt of about $500,000 (for the principal and interest amounts to that sum) on a people two thirds of whom were unable to understand the language in which the pretended contract was written. The act of congress was passed to prevent the perpetration of such wrongs. It was no doubt intended to operate, and did operate, as a disapproval, and therefore as an abrogation, of the act of the legislature of this territory which authorized the issuance of bonds of this character. It is not the province of

the courts to deal with the policy of congress, otherwise much might be said in commendation of this wise legislation. We have seen territories referred to as being in "a state of pupilage." This term is peculiarly applicable to this territory. In a very striking sense it is the pupil and ward of the nation. Pastoral in their habits, conservative in their aspirations, a very large portion of its population live in their mountain homes, and follow their flocks as did their fathers before them. It is the business of the courts to protect them, and to see that their homes and their property are not confiscated to satisfy the greed of corporations.

